**Alexander C. Johnson, Jr.**, Oregon State Bar No. 782588
alex@techlaw.com
**Hillary A. Brooks**, Oregon State Bar No. 012138
hillary@techlaw.com
MARGER JOHNSON & McCOLLOM, P.C.
210 SW Morrison Street, Ste. 400
Portland, Oregon  97204
Phone: (503) 222-3613
Fax:    (503) 274-4622

**Attorneys for Plaintiffs**

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| **TOO MARKER PRODUCTS, INC.**, a Japanese corporation, and **IMAGINATION INTERNATIONAL, INC.**, an Oregon corporation,<br><br>                    Plaintiffs,<br><br>        v.<br><br>**SHINHAN ART MATERIALS, INC.**, a Korean corporation, **SHINHAN USA, C2F, INC.**, an Oregon corporation, and **BONGKEUN HAN**, an individual,<br>                    Defendants. | Case No. CV-09-1013-PK<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>ORAL ARGUMENT REQUESTED |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs, by and through their undersigned counsel, hereby submit this Memorandum in Support of their Motion for Preliminary Injunction.  Plaintiffs request that the Court issue a preliminary injunction to restrain Defendants from further acts of infringement during the pendency of this case.

# TABLE OF CONTENTS

*I. INTRODUCTION* .................................................................................................. *1*

*II. STATEMENT OF FACTS* ................................................................................. *2*

      **A.**      **Too Marker Created the Market for Quality Markers in the U.S. and Japan** ........................................................................................................... **2**

      **B.**      **Too Marker Introduced the Art Marker Revolution to the United States** . **7**

      **C.**      **Shinhan is a Copyist, Not an Innovator** ........................................................ **8**

      **D.**      **Shinhan Redesigned TOUCH to Look Like the COPIC Marker** ................ **9**

      **E.**      **Copying Giving Rise to the Present Suit** ...................................................... **11**

*III. ARGUMENT* ...................................................................................................... *12*

      **B.**      **Plaintiffs are Likely to Succeed on the Merits of their Federal Trade Dress Infringement and Unfair Competition Claims Given the Near Identity of the Respective Configurations** ...................................................................... **13**

            **1.**      **Plaintiffs are Likely to Succeed on the Merits of their Federal Trademark Infringement Claim Because the TOUCH marker is Confusingly Similar to the COPIC Trade Dress and Plaintiff's Registered Configuration** ............................... 13

                (a)    Too Marker Owns the Trade Dress for the Product Configuration of the COPIC Marker ........................................................................................... 13

                (b)    Shinhan Has Used Plaintiffs' Product Configuration Without Authorization by Selling Square-Bodied and Square End-Capped TOUCH Markers in the U.S. ................................................................................................................ 14

                (c)    Defendants' TOUCH Markers are Likely to Cause Confusion with Plaintiff's Product Configuration and the COPIC Trade Dress ....................................... 14

                    (1)    Plaintiffs' product configuration and trade dress are strong because they define the marker's source rather than a particular characteristic of a marker. ....................................................................................... 15

                    (2)    Defendants' and Plaintiffs' goods are in close proximity because both parties sell the same goods to the same customers through the same trade channels. ...................................................................................... 16

                    (3)    Defendants' TOUCH product configuration is nearly identical to Plaintiffs' COPIC product configuration and trade dress. .................. 17

                    (4)    Customers are already experiencing confusion caused by Defendants' TOUCH markers. ................................................................................. 18

                    (5)    Defendants and Plaintiffs use the same marketing channels for their respective markers. .............................................................................. 19

                    (6)    Many marker customers are not likely to use a high degree of care in their purchasing decisions. ................................................................. 19

                    (7)    Shinhan's use of the TOUCH configuration commenced in bad faith with prior knowledge of Too Marker's COPIC configuration and trade dress. ................................................................................................... 21

                    (8)    The likelihood of expansion of the product lines is not relevant here because Plaintiffs' and Defendants' product lines are already identical. ................................................................................................. 22

                (d)    Plaintiffs are Likely to Succeed on Their Trademark Infringement Claim ..... 22

2.      **Plaintiffs are Likely to Succeed on the Merits of their Unfair Competition Claim Because Defendants are Selling Confusingly Similar Products and  Too Marker's Product Configuration and Trade Dress are Nonfunctional and Distinctive** ........23

      (a)    Plaintiffs' Product Configuration and Trade Dress is Nonfunctional Because it Does Not Put Competitors at a Significant, Non-Reputation-Related Disadvantage ......................................................................................23

           (1)    Plaintiffs' product configuration and trade dress as a whole do not yield a utilitarian advantage because they do not affect the marker's functionality. ....................................................................................24

           (2)    Alternative designs are available to Plaintiffs' product configuration and trade dress and are in use by competitors. ...................................25

           (3)    Plaintiffs' have not touted any essential utilitarian advantages of Plaintiffs' product configuration in advertising...................................25

           (4)    Plaintiffs' product configuration does not result from a comparatively simple or inexpensive method of manufacture and instead, increases the costs of manufacture........................................................................26

           (5)    Plaintiffs' square-bodied product configuration and square end cap trade dress are nonfunctional.............................................................26

      (b)    Plaintiffs' Square End Cap has Acquired Secondary Meaning Owing to Its Long and Exclusive Use and Consumer Recognition of It as a Source Identifier ......................................................................................................27

      (c)    Defendants TOUCH Product Configuration is Likely to Cause Confusion Because it is Nearly Identical to Plaintiff's Product Configuration and Trade Dress ....................................................................................................29

      (d)    Plaintiffs are Likely to Succeed on Their Federal Unfair Competition Claim 30

C.      **Plaintiffs Have and Will Continue to Suffer Irreparable Harm Due to Lost Sales, Loss of Goodwill, Price Erosion, and Lost Opportunities to Sell Other Goods**................................................................................... 30

D.      **The Balance of Equities Favors Plaintiffs Over Defendants Because Defendants Cannot Complain of Hardships They Brought Upon Themselves**........................................................................................ 32

E.      **Trademark Law Protects the Public from Confusion and Thus the Public Interest Favors Granting Relief**.................................................. 34

F.      **The Court Should Exercise Its Discretion and Issue a Preliminary Injunction to Protect Plaintiffs and the Public from Further Infringement and Unfair Competition**.............................................................. 35

*IV.  CONCLUSION*.................................................................................... *35*

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF AUTHORITIES

## CASES

*adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029 (D.Or. 2008)...........15

*Adidas-Salomon AG v. Target Corp.*, 228 F.Supp.2d 1192 (D.Or. 2002) ..............................26

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046 (9th Cir. 2009) ................12

*AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341 (9th Cir. 1979)..................................................15

*Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist.*, 868 F.2d 1085 (9th Cir. 1989) .................................................................................................................................12

*Brookfield Comm. v. West Coast Enter. Group*, 174 F.3d 1036 (9th Cir. 1999) ...................20

*Clicks Billiards v. Sixshooters Inc.*, 251 F.3d 1252 (9th Cir.2001) ........................................23

*CytoSport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F.Supp.2d 1051 (E.D.Cal. 2009)....12, 19, 20, 23, 29, 32, 33

*Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282 (C.D.Cal. 2001) ....................................................................................................................................13

*E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280 (9th Cir.1992) ..............................16

*Garcoa, Inc. v. PH Beauty Labs, Inc.*, 2009 WL 2489223 (C.D.Cal. 2009) ....................12, 19

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000).......................................20

*Grooms v. Legge*, 2009 WL 704644 (S.D.Cal. 2009)..............................................................20

Inwood Labs., Inc. v. Ives Labs. Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982) .......................................................................................................................................34

*K-Swiss, Inc. v. USA AISIQI Shoes Inc.*, 291 F.Supp.2d 1116 (C.D.Cal. 2003).........21, 24, 26

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) 12, 15, 30

*Maxim Integrated Products, Inc. v. Quintana*, 2009 WL 2136963 (N.D.Cal. 2009) .............19

*Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F.Supp.2d 1271 (C.D.Cal. 2008)..........32, 33

*Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F.Supp.2d 965 (N.D.Cal. 2006)................20

*Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp.2d 1067 (C.D.Cal.2004) .............................34

*Qualitex Co. v. Jacobson Prods. Co., Inc.*, 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995) ...........................................................................................................................23

*Resource Lenders, Inc. v. Source Solutions, Inc.*, 404 F.Supp.2d 1232 (E.D.Cal. 2005) .......34

*Shuffle Master Inc. v. Awada*, 2006 WL 2547091 (D.Nev. 2006) ..........................................25

*Symantec Corp. v. CD Micro, Inc.*, 286 F.Supp.2d 1265 (D.Or. 2003)..................................22

*Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F.Supp.2d 1206 (C.D.Cal. 1998) ... 13, 22

*Vision Sports, Inc. v. Melville, Corp.*, 888 F.2d 609 (9th Cir.1989) ........................................23

*Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000) ...........................................................................................................................23

## STATUTES

15 U.S.C. § 1057 .......................................................................................................................13

15 U.S.C. § 1115 .......................................................................................................................13

15 U.S.C. § 1125 .......................................................................................................................30

# I.  INTRODUCTION

Plaintiff Too Marker Products, Inc. ("Too Marker") is the developer of a quality, square-bodied, square end-capped, double-nibbed marker sold in the United States and elsewhere under the COPIC mark.  Plaintiff Imagination International, Inc. ("III") is the United States distributor of Too Marker's COPIC-brand products.  Too Marker first developed the COPIC marker twenty years ago in Japan and has been selling it in the U.S. through III for the last ten years.  In recognition of the distinctiveness of the square-bodied configuration, Plaintiffs obtained a U.S. trademark registration for the configuration.

Over the course of several years, Defendant Shinhan has been attempting to trade on Plaintiff's distinctive markers by selling inferior, and therefore cheaper, copies of the markers.  This attempt is best demonstrated by the creeping design of Defendant's TOUCH marker, which has evolved over time to be a near duplicate of Plaintiff's COPIC marker, as shown in Figure 1 below.



Figure 1. Side-by-Side Image of Plaintiffs' COPIC Marker and Defendants' TOUCH Marker

Plaintiff learned in late June that a copycat TOUCH marker was being offered for sale in the United States, and thereafter filed the present suit.  Although the parties entered discussions about a possible resolution following the filing of the Complaint, Defendant Shinhan has not been willing to withdraw the offending TOUCH marker from the U.S. market, and is instead increasing its efforts to harm Plaintiffs in the United States by exhibiting the new TOUCH marker in a Savannah, Georgia trade show as recently as September 30, 2009.

At the time of Defendant Shinhan's most recent redesign of the TOUCH marker, it had actual and constructive notice of Plaintiff Too Marker's ownership of the square-bodied marker based both on Too Marker's trademark application and registration, as well as a 2007 lawsuit pending in Germany between distributors of both products.

Defendants' infringing products have already caused Plaintiffs lost sales, reduced Plaintiff Too Marker's control over its exclusive product configuration, and caused actual customer confusion.  Defendants' refusal to withdraw the infringing marker from the US market after notice is further causing price erosion and dilution which will effectively destroy the value of Plaintiff's registered product configuration unless the Court issues a preliminary injunction to retrain further acts of infringement.

## II.  STATEMENT OF FACTS

### A.    Too Marker Created the Market for Quality Markers in the U.S. and Japan

Art markers are a different breed of animal.  While art markers have been a staple in Japan for decades, throw-away markers dominated the U.S. market until recently.  Having seen Too Marker's success in creating a market for quality markers, Defendant Shinhan is

now hoping to capitalize on Too Marker's success by selling a knock-off marker designed to look like Too Marker's iconic marker.

Rather than simply being a lucky beneficiary of the art marker craze in Japan, Too Marker played a major role in bringing it about. Since 1984, Too Marker (initially as Magic Marker Corporation of Japan) has been innovating and improving its markers with the express intention of producing a line of high-quality, re-usable, long-lasting markers for the art market. DECLARATION OF TOSHI YOKOYAMA ("YOKOYAMA DECL."), ¶ 2. Through perseverance, hard work, and a substantial monetary investment, Too Marker developed a product line that was able to meet the demands of the skilled artisans and home hobbyists that now rely on its products. *Id*. at ¶ 3.

The 1980s brought the advent of the laser copy machine, which enabled computer-based artists to produce their works more easily, as well as enabled them to freely enlarge, reduce and transform drawings. YOKOYAMA DECL., at ¶ 4. Designers began to efficiently create greater quantities of work which could be independently colored to achieve the design aesthetic they sought. *Id*. at ¶ 5. Traditional markers with xylene-based inks dissolved the toner of the copies and destroyed the artwork. *Id*. at ¶ 6. To meet the demands of this market, Too Marker set about designing a new marker which would not dissolve the toner and thereby jeopardize the artist's work. *Id*. at ¶ 7. The result of this effort was an alcohol based marker. *Id*.

Rather than simply changing the ink from the traditional marking pen, Too Marker sought a quality marker which used non-toxic ink, and which could achieve economic efficiency by using refillable ink and replacement nibs. YOKOYAMA DECL., at ¶ 8. In designing its product, Too Marker moved away from the inexpensive, disposable markers

that were the standard of the day and created a quality, long-life product that customers were willing to pay more for. *Id*. at ¶ 9.

In the mid 1980s, the standard marker had a round barrel with a single, tapered end to facilitate capping of the marker. YOKOYAMA DECL., at ¶ 10. Because the markers were made by a simple injection molding process, the taper facilitated removal of the marker and end cap from the mold. *Id*.

Wanting a product that stood out from the crowd of markers, Too Marker designed a square-bodied marker with a tight-fitting cap that did not require a taper. YOKOYAMA DECL., at ¶ 11. Rather than relying on a single end, with a single nib, Too Marker designed a double-nibbed marker with quality nibs that could withstand repeated use without dulling or smearing. This design effort consumed three years and significant company resources. The resulting product is the COPIC line of markers. *Id*. at ¶ 12.

At the time Too Marker set about designing its COPIC marker, it was told that it was impossible to manufacture an un-tapered marker through plastic injection molding. YOKOYAMA DECL., at ¶ 13. Too Marker experienced many failures before it finally succeeded with its COPIC line. *Id*. at ¶ 14.

Starting with a range of 72 colors, Too Marker expanded to a line of 144 colors, and finally to the 214 colors it offers today. YOKOYAMA DECL., at ¶ 15. In conjunction with the development of the marker line, Too Marker also innovated other aspects of marker use, including multiple ink varieties for refills, replacement nibs, and different shaped and contoured markers. *Id*. at ¶ 16. Too Marker has also developed an airbrush system that works in conjunction with the markers. *Id*. at ¶ 17.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

The standard marker in the mid 1980s used paper or plastic labels that were easily smudged or smeared through use and finger contact, resulting in a poor-looking product. YOKOYAMA DECL., at ¶ 18.  Too Marker adopted silkscreen printing to achieve a higher-quality appearance.  *Id*. at ¶ 19.  Because silkscreen printing ink did not stick to the polypropylene base of the COPIC marker, Too Marker had to create a special process for silkscreen printing.  *Id*. at ¶ 20.  Traditional markers of the day also used paper or plastic labels to show the color on the top of the cap or barrel of the marker.  *Id*. at ¶ 21.  Too Marker instead used a plastic color end cap insert with a silkscreen print of the color name and code at the top of the cap.  *Id*.

In achieving the desired look for its COPIC markers, Too Marker encountered numerous additional design challenges.  YOKOYAMA DECL., at ¶ 22.  For example, the squarish-shape, coupled with the alcohol in the ink, resulted in quick evaporation, which jeopardized the integrity of the ink.  *Id*.  To combat this problem, Too Marker refined its mold to ensure that the body of the marker would be airtight.  *Id*.  Due to initial skepticism of store owners in stocking the markers, Too Marker offered, and continues to offer, a three year guarantee that the ink in the markers will be usable at the time of sale.  *Id*. at ¶ 23.

Other challenges accompanying Too Marker's distinctive square shape came from the production of ink in the proper color and the matching of the ink to the square plastic color end cap.  YOKOYAMA DECL., at ¶ 24.  Markers of the day did not include plastic color inserts at the cap ends to identify to the user what the marker color was.  *Id*.  Too Marker had to develop a means for placing the insert into the cap to achieve a tight-fit.  *Id*.

Further, Too Marker's double-ended markers required the development of broad nibs for smooth drawing and narrow nibs for sharp drawing.  YOKOYAMA DECL., at ¶ 25.  Too

Marker invested much time and effort in developing nibs with an appropriate cutting angle, and the nib tip chamfered design of the nib holder and body end coming from the squarish-barrel. *Id*. at ¶ 26.

As part of its quality control process, and to justify the added expense of its markers, Too Marker checks the ink color in its COPIC marker three separate times before shipment. YOKOYAMA DECL., at ¶ 27. The ink is first checked at the time it is produced. *Id*. It is checked a second time at assembly and processing. *Id*. And, it is checked in a final inspection prior to shipment. *Id*. Each marker is independently tested for print quality, color, nib defects, cracks or scratches in the plastic, and ink leakage. *Id*. at ¶ 28. Air tightness is in turn checked lot by lot during the plastic injection stage. *Id*. Any ink that fails to meet the COPIC standard for color is immediately discarded. *Id*.

Too Markers' customers for the COPIC product line include architects and designers, including those in the Manga, Anime, and game illustration fields. YOKOYAMA DECL., at ¶ 29. They also include artists, art professors, paper crafters, caricaturists, and home hobbyists. *Id*. COPIC marker sales are responsible for ninety percent of the gross receipts of Too Marker, and thus represent the company's most important product line. *Id*. at ¶ 30.

Too Marker's marketing approach, to focus on quality and delivering a consistent product, was a successful one. YOKOYAMA DECL., at ¶ 31. Japanese customers began to purchase the COPIC line because of its smart design, its ink color, consistency, airtightness, and the fact that it is part of a bigger system of products, including airbrush attachments and replacement parts. *Id*.

Too Marker has been awarded numerous awards and distinctions for its COPIC line and images of COPIC markers have been used by top companies, such as BMW, in its

promotional literature.  YOKOYAMA DECL., at ¶ 32.  COPIC markers are the marker of choice

for Anime and Manga artists.  *Id.* at ¶ 33.  In recognition of COPIC's longevity and quality,

Too Marker won prestigious awards for the marker in Japan for Good Design in 1998 and

Longevity in Good Design in 1999 and 2009.  *Id.* at ¶ 34.   As a result of Too Marker's

design and marketing efforts, the square-bodied marker symbolizes quality.

**B.      Too Marker Introduced the Art Marker Revolution to the United States**

Having already developed a highly-successful product in Japan, Too Marker could

have simply brought the COPIC markers to the U.S. and flooded the market through a large

distributor.  YOKOYAMA DECL., at ¶ 35.  Instead, Too Marker looked for a U.S. distributor

that was committed to its vision of quality and customer service.  *Id.*  It found that in

Imagination International, Inc. ("III"), a Eugene company founded by an art professor, Ken

O'Connell Ph.D., then chair of the Art Department at the University of Oregon.  *Id.*

Approximately 10 years ago, Too Marker and III formed a joint venture committed to the

shared vision of building a customer base from the ground up, and building loyalty in those

customers through quality products, the same way Too Marker built its business in Japan.  *Id.*

at ¶ 36.

Prior to Too Marker's involvement with III, COPIC markers had little visibility in the

U.S., other than a loyal following familiar with the COPIC markers from experiences in

Japan.  DECLARATION OF JOHN DARLAND ("DARLAND DECL."), at ¶ 2.  To build familiarity,

III employees spent the first four years on the road, engaging in face-to-face meetings with

potential customers in the business, art, and education fields to introduce them to the product

and train them in its use.  *Id.* at ¶ 3.  III still regularly attends tradeshows for retailers, and

seeks out concentrations of potential end users to inform them about the products it offers

and their use. *Id*. This significant investment in education, training, and travel has helped III develop the US market for the COPIC marker and is largely responsible for the manner in which the product has taken off in the US. *Id*. at ¶ 4. Further, it has educated the U.S. art market to the concept of a quality marker. *Id*.

Today, the product enjoys a substantial and growing customer base of artists, hobbyists, and others who use the markers. DARLAND DECL., at ¶ 5. Plaintiffs' sales of products bearing the square-bodied and square end-capped product configuration have grown from 17,280 units in year 2000 to over 225,000 units in 2007. *Id*. at ¶ 6. The wholesale dollar volume of sales of Plaintiffs' products from 2000 through 2007, shows an approximately tenfold increase. *Id*. at ¶ 7. Further, the number of retail outlets in the U.S. selling Plaintiffs' products has increased nearly 20 times between 2000 and 2007. *Id*. at ¶ 8. Plaintiffs' advertising expenditures have also seen substantial growth during this time. *Id*.

Too Marker and III attend trade shows throughout the U.S., Europe and Japan to show the latest product offerings. DARLAND DECL., at ¶ 9. For many years, Too Marker has been a regular exhibitor at the Anime Expo, an important convention for Anime and Manga artists that represents a rapidly growing segment of the art marker industry. *Id*. at ¶ 10. Thus, in the U.S., as in Japan, COPIC has achieved iconic status in the art marker industry and the square-bodied shape has come to represent a symbol of quality.

## C.    Shinhan is a Copyist, Not an Innovator

Shinhan is not a product development company. Shinhan's primary marketing strategy is instead to copy successful products and sell them at a lower price and quality than the original. Familiar with Too Marker's success with the COPIC line in Japan, Shinhan, a

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Korean Company, created the TOUCH marker in an effort to copy the COPIC markers, albeit a lower-quality copy. DARLAND DECL., at ¶ 11.

By choosing to copy the COPIC marker, rather than develop its own product, Shinhan saved itself the substantial time and expense associated with product development that Too Marker had invested. YOKOYAMA DECL., at ¶ 37. Unlike Too Marker, which set about building brand loyalty in its target market, Shinhan seeks out distributors, generally those carrying COPIC markers, in an effort to undercut the Too Marker price and reach Too Marker's customer base. DARLAND DECL., at ¶ 12.

Defendant Shinhan is now attending the same conventions as Plaintiffs and requesting adjacent booths. DARLAND DECL., at ¶ 13. Shinhan has been so successful in its copying of both Too Marker's product and marketing strategy that customers at trade shows have attempted to return TOUCH markers to Too Marker after purchasing them from Shinhan and being dissatisfied with their performance. *Id.* at ¶ 14. Too Marker and III have also been asked about the "cheaper COPIC line", the "black COPIC line", etc., comments which make it clear that the speaker believes the TOUCH marker is a cheaper COPIC marker. *Id.* at ¶ 15.

The TOUCH line is a knock-off product with less attention to quality. It has an ill-fitting cap which results in dried-up ink and a reduced product lifetime. DARLAND DECL., at ¶ 16.

**D.      Shinhan Redesigned TOUCH to Look Like the COPIC Marker**

Shinhan's first version of the TOUCH marker ("TOUCH 1") was a white-bodied, rounded end cap marker, with a glued on vertical paper strip indicating ink color, as shown below in Figure 2.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

 

Figure 2. TOUCH 1 Marker                    Figure 3.  TOUCH 2 Marker

After Too Marker released an anniversary edition of its COPIC marker with a black body, Defendant Shinhan began to sell a black-bodied, double-ended marker, with a squared-off end that more closely approximated the appearance of the COPIC marker ("TOUCH 2"), as shown above in Figure 3.  YOKOYAMA DECL., at ¶ 38.  As seen in Figure 3, the TOUCH 2 marker was much closer to square in cross-section, but still included paper stickers to identify the color of the marker.  This second version of the TOUCH marker became the basis of a 2007 lawsuit pending in Germany between Too Marker and Shinhan distributor(s). *Id.* at ¶ 39.

Apparently not content with TOUCH version 2, Defendant Shinhan then designed a full-fledged copy of the COPIC marker, as shown in Figure 4.



Figure 4. Image of Defendants' TOUCH 3 Marker

It is the release of this third version, TOUCH 3, in the United States that instigated the Complaint in this matter, and is the basis of this preliminary injunction motion.

**E.      Copying Giving Rise to the Present Suit**

In 2007, Plaintiff Too Marker's European distributor became aware that Shinhan distributors were selling the TOUCH 2 marker in Europe, prompting litigation between the parties.   YOKOYAMA DECL., at ¶ 40.   To Plaintiffs' knowledge Defendants have not previously sold this marker in the U.S.   *Id.*  Shinhan later introduced the TOUCH 3 marker in Europe and it is included in the European litigation.  *Id.* at ¶ 41.

In late June 2009, Plaintiffs learned that Defendants were beginning to offer square-bodied and square end-capped markers with color inserts in the United States under the TOUCH mark ("TOUCH 3").  YOKOYAMA DECL., at ¶ 42.  Shinhan displayed these markers at trade shows in the United States and began to offer them for sale at, among other places, Defendant C2F's website.  *Id.* at ¶ 43.

On August 11, 2009, Plaintiffs sent a letter to Defendant C2F, Inc., an Oregon corporation ("C2F"), requesting that C2F stop importing, distributing, advertising, and selling the TOUCH 3 markers in the United States.  DECLARATION OF TIMOTHY E. MURPHY ("MURPHY DECL."), at ¶ 2.  Plaintiffs' letter included side-by-side pictures of Plaintiffs' and Defendants' markers showing the near identity of the product configurations.  *Id.* at ¶ 3.  On August 20, 2009, Plaintiffs received a letter from Defendant Shinhan USA refusing to stop sales of the TOUCH 3 markers in the U.S., leading to the present suit.  *Id.* at ¶ 4.

Because of the ongoing dispute in Europe, Shinhan knew of Too Marker's claim to its distinctive square-bodied and square end-capped marker configuration before it altered the TOUCH marker to more closely mimic the COPIC markers.  Because Defendants' markers are low quality, they can now be sold in the U.S. for approximately half of the price of Plaintiffs' markers.  DARLAND DECL., at ¶ 17.  The appearance of a nearly identical marker,

at a significantly lower price, and lower-quality, can only serve to confuse customers and damage the goodwill Plaintiffs have established in the COPIC markers over the last ten years.

## III.  ARGUMENT

### A.    Legal Standard for Granting a Preliminary Injunction

Federal Rule of Civil Procedure 65 gives the Court discretion to issue a preliminary injunction.  *See Big Country Foods, Inc. v. Board of Educ. of Anchorage School Dist.*, 868 F.2d 1085, 1087 (9th Cir. 1989). In the Ninth Circuit, the party seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009).  Although Plaintiffs are entitled to a presumption of irreparable harm upon a showing of success on the merits, here Plaintiffs can prove sufficient irreparable harm, even in the absence of the presumption.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 876-877 (9th Cir. 2009) (decided July 02, 2009; affirming issuance of preliminary injunction using the presumption)*, compare Garcoa, Inc. v. PH Beauty Labs, Inc.*, 2009 WL 2489223, 2 (C.D.Cal. 2009) ("the Court will presume irreparable injury because trademark damages are, by their very nature, irreparable") *with CytoSport, Inc. v. Vital Pharmaceuticals, Inc.*, 617 F.Supp.2d 1051, 1065 (E.D.Cal. 2009) (decided May 06, 2009; holding that there is no presumption, citing *Am. Trucking,* 559 F.3d at 1052-1053).

**B.**     **Plaintiffs are Likely to Succeed on the Merits of their Federal Trade Dress Infringement and Unfair Competition Claims Given the Near Identity of the Respective Configurations**

      **1.**     **Plaintiffs are Likely to Succeed on the Merits of their Federal Trademark Infringement Claim Because the TOUCH marker is Confusingly Similar to the COPIC Trade Dress and Plaintiff's Registered Configuration**

The elements of a claim for Federal trademark infringement are: (1) ownership of the trademark; (2) use by defendant, without authorization, of a copy, reproduction, counterfeit or colorable imitation of the moving party's mark in connection with the sale, distribution or advertising of goods or services; and (3) that defendant's use of the mark is likely to cause confusion, or to cause mistake or to deceive. *Toho Co., Ltd. v. William Morrow and Co., Inc.*, 33 F.Supp.2d 1206, 1210 (C.D.Cal. 1998). Plaintiffs can establish each of these elements and are thus likely to succeed on their claim for trademark infringement.

      (a)     <u>Too Marker Owns the Trade Dress for the Product Configuration of the COPIC Marker</u>

"Trademark registrations are *prima facia* evidence of ownership and exclusive right to use a mark in commerce, without restriction or limitation, on the products and services specified in the registration." *Discovery Communications, Inc. v. Animal Planet, Inc.*, 172 F.Supp.2d 1282, 1288 (C.D.Cal. 2001) (*citing* 15 U.S.C. §§ 1057(b) and 1115(a)). Too Marker Products owns United States Trademark Registration No. 3,629,617 for the product configuration of a square-bodied marker. MURPHY DECL., at ¶ 5. Too Marker likewise owns the trade dress of a square end-capped marker. For purposes of the trademark infringement claim, Plaintiffs own the product configuration and trade dress at issue.

(b)    Shinhan Has Used Plaintiffs' Product Configuration Without
        Authorization by Selling Square-Bodied and Square End-Capped
        TOUCH Markers in the U.S.

In June 2009, Plaintiffs learned that Defendants were importing and selling square-bodied markers, including square end caps, in the United States under the TOUCH line (TOUCH 3). YOKOYAMA DECL., at ¶ 42. As an example, Defendant C2F's website enables retailers to purchase the TOUCH line of square-bodied, square end-capped markers. MURPHY DECL., at ¶ 6. Square-bodied, square end-capped TOUCH markers are also offered in the U.S at: http://pureg.net; http://www.refuelled.com; http://www.aswexpress.com; and http://www.jerrysartarama.com. MURPHY DECL., at ¶ 7. During the first week of July 2009, Defendants displayed their square-bodied, square end-capped TOUCH markers at Anime Expo, a trade show, in Los Angeles, California. DARLAND DECL., at ¶ 18.

Plaintiffs did not authorize Defendants to import and sell square-bodied or square end-capped markers in the United States or to display square-bodied or square end-capped markers at trade shows in the U.S. DARLAND DECL., at ¶ 19. Accordingly, Defendants have used Plaintiffs' product configuration and trade dress without authorization in connection with the sale of marker products.

(c)    Defendants' TOUCH Markers are Likely to Cause Confusion with
        Plaintiff's Product Configuration and the COPIC Trade Dress

The Ninth Circuit uses the *Sleekcraft* factors in analyzing the likelihood of confusion: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) defendant's intent in selecting the mark; and (8)

likelihood of expansion of the product lines. *See AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 -349 (C.A. Cal. 1979); *see also Marlyn Nutraceuticals*, 571 F.3d at 876-877.  In the present case, each of the *Sleekcraft* factors either weigh in favor of a likelihood of confusion or are not relevant.

> (1) *Plaintiffs' product configuration and trade dress are strong because they define the marker's source rather than a particular characteristic of a marker.*

Plaintiffs' square-bodied marker configuration consists of "a configuration of a marker having a squarish cross-sectional shape in which terminal portions of both end caps of the marker are indented relative to the body of the marker and a band, which indicates the placement of a contrasting color, is integrally formed in the body of the marker at the juncture of the end cap and body, the squarish cross-section having rounded corners and the end caps having flat ends."  MURPHY DECL., at ¶ 5.

Plaintiffs' trade dress consists of a marker end cap having a squarish cross-sectional shape.

Plaintiff's product configuration does not define particular characteristics of a marker. Rather, the configuration identifies the source of the product.  For example, the square body of Plaintiffs' product configuration does not define any particular characteristic of a marker or identify the product as a marker.  The same is true of the square end caps.  Therefore, in the spectrum of trademark distinctiveness, Plaintiffs' square-bodied marker configuration is at least arbitrary when used in connection with marker products. *See adidas-America, Inc. v. Payless Shoesource, Inc.*, 546 F.Supp.2d 1029, 1056 (D.Or. 2008) (finding that three-stripe mark in connection with shoes is arbitrary).

Similarly, Plaintiffs' square end cap marker trade dress does not define any particular characteristics of a marker. For example, the squarish cross-sectional shape of Plaintiffs' trade dress does not define any particular characteristic of a marker or identify the product as a marker. Therefore, in the spectrum of trademark distinctiveness, Plaintiffs' trade dress is at least arbitrary when used in connection with marker products.

As arbitrary marks, Plaintiffs square body and end cap trade dress and product configuration are entitled to "maximum protection" as trademarks. *See E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir.1992). Consequently, Plaintiffs' product configuration and trade dress are strong marks and thus this factor weighs in favor of a likelihood of confusion.

> (2)    *Defendants' and Plaintiffs' goods are in close proximity because both parties sell the same goods to the same customers through the same trade channels.*

Plaintiff Too Marker manufactures its COPIC line of marker products in Japan and sells them to various retail outlets in the United States through Plaintiff III, as well as directly to consumers. DARLAND DECL., at ¶ 20. Defendants manufacture their TOUCH line of marker products in Korea and sell them to various retail outlets in the United States, including Defendant C2F, as well as directly to consumers. *Id.* at ¶ 21. Additionally, both Plaintiffs and Defendants offer their respective marker products through the internet. *Id.* at ¶ 22. Both Plaintiffs and Defendants have offered their respective marker products for sale through trade shows in the U.S. *Id.* at ¶ 23. Thus, Plaintiffs and Defendants are offering the same goods to the same customers through the same trade channels. Therefore, Plaintiffs'

and Defendants' goods and services are in close proximity and this factor weighs in favor of a likelihood of confusion.

> (3)     *Defendants' TOUCH product configuration is nearly identical to Plaintiffs' COPIC product configuration and trade dress.*

Plaintiffs' registered product configuration consists of "a squarish cross-sectional shape in which terminal portions of both end caps of the marker are indented relative to the body of the marker and a band, which indicates the placement of a contrasting color, is integrally formed in the body of the marker at the juncture of the end cap and body, the squarish cross-section having rounded corners and the end caps having flat ends." MURPHY DECL., at ¶ 5.

Defendants' TOUCH 3 line of markers includes: a squarish cross-sectional shape; end caps with terminal portions indented relative to the body of the marker; a contrasting color band integrally formed in the body of the marker at the juncture of the end cap and body; rounded corners in the squarish cross-sectional shape; and end caps having flat ends.

Plaintiffs' marker end cap trade dress consists of an end cap having a squarish cross-sectional shape. Defendants' TOUCH 3 line of markers includes an end cap having a squarish cross-sectional shape, as shown above in Figure 4.

Therefore, Defendants' product configuration is nearly identical to Plaintiffs' product configuration and trade dress. Consequently, this factor weighs in favor of a likelihood of confusion.

(4)     *Customers are already experiencing confusion caused by Defendants' TOUCH markers.*

Despite that Defendants have only recently begun selling their TOUCH markers in the U.S., customers are already exhibiting confusion. At the Anime Expo in June 2009, a customer purchased TOUCH markers from Defendants' booth. The customer came to Plaintiffs' booth and asked to return the markers for a refund. DARLAND DECL., at ¶ 24. The customer apparently did not notice any difference between the markers purchased at Defendants' booth and the markers being sold at Plaintiffs' booth. Several other attendees also expressed confusion between Plaintiffs' booth and Defendants' booth at the show. *Id.*

When presented with one of Defendants' markers and one of Plaintiffs' markers, showing the sides without labels, as in Figure 5, Plaintiffs' customers have indicated that they could not tell which marker originated with which company. DARLAND DECL., at ¶ 25.



Figure 5. Image of Plaintiff's and Defendant's Markers from Side View

Additionally, some of Plaintiffs' customers have asked if Plaintiffs are now selling a low-cost, lower-quality line (referring to the TOUCH markers) because of the near-identity of the product configurations. *Id.* at ¶ 26. Consequently, the actual confusion being exhibited by customers weighs in favor of a likelihood of confusion.

       (5)     *Defendants and Plaintiffs use the same marketing channels for their respective markers.*

Plaintiffs sell their COPIC line of marker products to various retail outlets in the United States, as well as directly to consumers. DARLAND DECL., at ¶ 20. Defendants sell their TOUCH line of marker products to various retail outlets in the United States, as well as directly to consumers. *Id.* at ¶ 21. Additionally, both Plaintiffs and Defendants offer their respective marker products through the internet, through some of the same distributors, and at the same trade shows. *Id.* at ¶¶ 22 and 23. That Defendants and Plaintiffs use the same marketing channels weighs in favor of a likelihood of confusion.

       (6)     *Many marker customers are not likely to use a high degree of care in their purchasing decisions.*

When assessing the degree of care of purchasers, some courts look to what the reasonably prudent purchaser, using ordinary caution, would do to distinguish between the two product lines. *Maxim Integrated Products, Inc. v. Quintana*, 2009 WL 2136963, 6 (N.D.Cal. 2009). When goods are more expensive, the court assumes purchasers will exercise greater care. *Id.* In other words, "[t]he ordinary purchaser is assumed to take more care in purchasing expensive items which he or she buys infrequently, than in buying everyday, relatively inexpensive items." *Garcoa*, 2009 WL at 8. Even if the purchasers are assumed to be relatively sophisticated, where the goods are inexpensive products, this factor weighs in favor of confusion. *CytoSport*, 617 F.Supp.2d at 1077.

Plaintiffs' COPIC marker products sell for approximately five dollars per marker, with twelve-packs of markers selling for approximately sixty dollars. DARLAND DECL., at ¶ 27. Defendants' TOUCH markers are advertised in the range of approximately thirty to

thirty-five dollars for twelve-packs and as low as two dollars per marker on websites. MURPHY DECL., at ¶ 7. Therefore, Plaintiffs' and Defendants' products are not expensive products for purposes of assessing purchaser care. *See, e.g.*, *CytoSport*, 617 F.Supp.2d at 1076 (purchasers of $3-$5 protein drinks not likely to exercise a high degree of care) ; *Grooms v. Legge*, 2009 WL 704644, 8 (S.D.Cal. 2009) (purchasers of tee shirts are unlikely to exercise great care in their purchase); *Nova Wines, Inc. v. Adler Fels Winery LLC*, 467 F.Supp.2d 965, 981-982 (N.D.Cal. 2006) (wine purchasers are unlikely to exercise a high degree of care).

However, as has been established, Plaintiff's COPIC marker products are sold both to design professionals and to home hobbyists. Each of these groups is likely to exercise a different level of care when making their marker purchases. As a result, where the relevant consumer is a mixed group of buyers including both professionals and the general public, the applicable standard is that of the least sophisticated consumer. *See GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000). Accordingly, this factor weighs in favor of a likelihood of confusion.

Nevertheless, under either the reasonably prudent purchaser analysis or the least sophisticated consumer approach, purchaser confusion is not sufficient to overcome the likelihood of confusion in this case. *See Brookfield Comm. v. West Coast Enter. Group*, 174 F.3d 1036 1060 (9th Cir. 1999).

> (7)    *Shinhan's use of the TOUCH configuration commenced in bad faith with prior knowledge of Too Marker's COPIC configuration and trade dress.*

Plaintiff Too Marker and Defendant Shinhan, among others, have been engaged in ongoing litigation in Europe relating to the prior version of the TOUCH 2 square-bodied marker products since as early as 2007. YOKOYAMA DECL., at ¶ 40. Consequently, Defendants have known of Plaintiffs square-bodied marker configuration and square end cap trade dress for several years. Despite this knowledge, in 2009 Defendants offered a competing product in the United States with essentially the same product configuration. Thus, an inference can be drawn that Defendants began using their product configuration in bad faith. *See, e.g.*, *K-Swiss, Inc. v. USA AISIQI Shoes Inc.*, 291 F.Supp.2d 1116, 1125 (C.D.Cal. 2003) (drawing an inference of intent to deceive the public based on the plaintiff's strong reputation and the similarity of the infringing marks).

Further, as discussed above, changing to a square-bodied marker configuration presents additional cost and many design challenges. YOKOYAMA DECL., at ¶¶ 11-14. The same is true of the square end-cap trade dress. *See id.,* at ¶¶ 21-22. Thus, there was no reason for Shinhan to take on this additional expense other than to trade off the goodwill Plaintiffs had built up in their square-bodied marker configuration and trade dress. Shinhan's bad faith can be inferred from the detailed similarities described above. As a result, this factor weighs in favor of a likelihood of confusion, and supports the issuance of an injunction.

> (8)    *The likelihood of expansion of the product lines is not relevant here because Plaintiffs' and Defendants' product lines are already identical.*

The *Sleekcraft* factors listed above are "intended only as a guide; the presence or absence of any particular factor does not mandate or preclude a finding of likelihood of confusion." *Toho*, 33 F.Supp.2d at 1213. In the present case, the factor addressing the likelihood of expansion of product lines is not relevant because Plaintiffs and Defendants are offering the same products. DARLAND DECL., at ¶ 28. In other words, because Plaintiffs and Defendants are offering the same products already, it is not necessary to inquire into whether the product lines will eventually overlap due to expansion. *See, e.g.*, *Symantec Corp. v. CD Micro, Inc.*, 286 F.Supp.2d 1265, 1274 (D.Or. 2003) (likelihood of expansion factor not applicable when parties selling identical software product). Consequently, this factor does not weigh in the likelihood of confusion analysis for this case, and if it did, would weigh squarely in favor of a likelihood of confusion.

(d)    <u>Plaintiffs are Likely to Succeed on Their Trademark Infringement Claim</u>

Plaintiff Too Marker owns a registered trademark for its marker product configuration. Defendants have used a nearly-identical marker product configuration, including Plaintiff's trade dress, without authorization from Plaintiffs in connection with the sale of marker products. Defendants' use of Plaintiffs' product configuration and trade dress is likely to cause confusion. Consequently, Plaintiffs are likely to succeed on the merits of their Trademark Infringement claim.

**2.      Plaintiffs are Likely to Succeed on the Merits of their Unfair Competition Claim Because Defendants are Selling Confusingly Similar Products and Too Marker's Product Configuration and Trade Dress are Nonfunctional and Distinctive**

A seller's adoption of a trade dress confusingly similar to a competitor's constitutes actionable unfair competition under section 43(a) of the Lanham Act. *Vision Sports, Inc. v. Melville, Corp.*, 888 F.2d 609, 613 (9th Cir. 1989). Trade dress infringement is found where: (1) the claimed trade dress is nonfunctional; (2) the trade dress serves a source-identifying role; and (3) the defendant's product or service creates a likelihood of consumer confusion. *CytoSport*, 617 F.Supp.2d at 1077 (*citing Clicks Billiards v. Sixshooters Inc.,* 251 F.3d 1252, 1258 (9th Cir.2001)). Trade dress for product configurations requires the further showing of acquired secondary meaning. *Id.* (*citing Wal-Mart Stores, Inc. v. Samara Bros., Inc.,* 529 U.S. 205, 214-15, 120 S.Ct. 1339, 146 L.Ed.2d 182 (2000)). Plaintiffs can establish each of these elements and thus are likely to succeed on the merits of their unfair competition claim.

(a)      Plaintiffs' Product Configuration and Trade Dress is Nonfunctional Because it Does Not Put Competitors at a Significant, Non-Reputation-Related Disadvantage

A product feature is functional if it is *essential* to the use or purpose of the article, affects the cost or quality of the article, or if exclusive use of the feature would put competitors at a significant, non-reputation disadvantage. *Qualitex Co. v. Jacobson Prods. Co., Inc.,* 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). *CytoSport*, 617 F.Supp.2d at 1078. When assessing functionality, courts consider whether the design provides a utilitarian advantage, whether alternative designs exist, whether advertising touts the utilitarian advantages of the design, and whether the design results from a comparatively simple or inexpensive method of manufacture.

Plaintiffs' registered product configuration consists of a squarish cross-sectional shape in which terminal portions of both end caps of the marker are indented relative to the body of the marker and a band, which indicates the placement of a contrasting color, is integrally formed in the body of the marker at the juncture of the end cap and body, the squarish cross-section having rounded corners and the end caps having flat ends. MURPHY DECL., at ¶ 5. Plaintiffs' marker end cap trade dress consists of an end cap having a squarish cross-sectional shape. As described below, Plaintiffs' product configuration and trade dress are nonfunctional.

> (1) *Plaintiffs' product configuration and trade dress as a whole do not yield a utilitarian advantage because they do not affect the marker's functionality.*

Plaintiffs' square-bodied marker configuration and square end cap trade dress are but one design among many that could have been chosen for Plaintiffs' markers YOKOYAMA DECL., at ¶ 44. To Plaintiffs' knowledge, the square-bodied configuration, including the contrasting-colored band, rounded corners, and the flat and indented end caps do not provide any utilitarian advantage for a user of the marker. Nor does the square end cap trade dress. *Id*. at ¶ 45. Although the square body of the marker can prevent the marker from rolling off of a desk when not in use, this is only one feature of Plaintiff's product configuration and, because the feature relates to the product when not in use, it necessarily cannot be an essential feature and thus does not yield a utilitarian advantage for Plaintiff's product configuration as a whole. *See, e.g.*, *K-Swiss*, 291 F.Supp.2d at 1121 (the fact that some aspects of the trade dress provide a utilitarian advantage does not render the trade dress

functional).  Accordingly, the lack of an essential utilitarian advantage in Plaintiffs' product configuration and trade dress weighs against a finding of functionality.

> (2)    *Alternative designs are available to Plaintiffs' product configuration and trade dress and are in use by competitors.*

There are many designs of markers in the marketplace.  For example, Neopiko and Prismacolor, among many others, sell markers that have circular and oval shapes.  DARLAND DECL., at ¶ 29.  In fact, Shinhan itself started out with a different, round design to its marker end cap.  Moreover, several manufacturers, including Crayola, sell markers having a triangular shape.  *Id.* at ¶ 30.  Consequently, there are many alternative designs available and in use in the marker industry.  Thus, the availability of alternative designs weighs against a finding of functionality.  *See, e.g.*, *Shuffle Master Inc. v. Awada*, 2006 WL 2547091, 4 (D.Nev. 2006) (the existence of competing products in the marketplace using alternate designs weighs against a finding of functionality.)

> (3)    *Plaintiffs' have not touted any essential utilitarian advantages of Plaintiffs' product configuration in advertising.*

Although Plaintiffs advertise their products extensively, Plaintiffs have not touted any essential utilitarian advantages of their marker configuration and end cap design.  DARLAND DECL., at ¶ 31.  While Plaintiffs have noted that the square bodies of their markers are resistant to rolling off of a work surface, this is a result of the square body alone and does not result from any of the remaining features of Plaintiffs' product configuration or trade dress. *Id.* at ¶ 32.  Moreover, any such advantage in the square body is only present when the markers are not in use as markers, and is incidental to the use of such markers.  *Id.*

Consequently, Plaintiffs have not touted any essential utilitarian advantages of their product configuration and this factor weighs against a finding of functionality.

> **(4)**    *Plaintiffs' product configuration does not result from a comparatively simple or inexpensive method of manufacture and instead, increases the costs of manufacture.*

Plaintiffs' product configuration and trade dress does not result from a comparatively simple or inexpensive method of manufacture.  YOKOYAMA DECL., at ¶ 46.  Quite the opposite, the square end cap, contrasting-color band and indented end caps of Plaintiffs' design actually increase the cost of manufacture as opposed to a solid color design without indented end caps.  *Id.* at ¶ 47.  Further, the square-bodied marker configuration is more difficult to mold than, for example, round-bodied markers and is thus more expensive to manufacture.  *Id.* at ¶ 48.  It is likewise more difficult to seal.  *Id.*  Consequently, this factor also weighs against a finding of functionality.  *See, e.g.*, *K-Swiss,* 291 F.Supp.2d at 1121 (finding stripe design on athletic shoe nonfunctional when the stripes added to the cost of manufacture); *Adidas-Salomon AG v. Target Corp.,* 228 F.Supp.2d 1192, 1195, 1203-1205 (D.Or. 2002) (finding toe and sole design for athletic shoe nonfunctional when design increased production costs).

> **(5)**    *Plaintiffs' square-bodied product configuration and square end cap trade dress are nonfunctional.*

In assessing the functionality of trade dress, courts look to whether the design yields an essential utilitarian advantage, whether alternative designs are available, whether advertising touts the utilitarian advantages of the design, and whether the particular design results from a comparatively simple or inexpensive method of manufacture.  Here, Plaintiffs'

design does not yield a utilitarian advantage and Plaintiffs' have not touted any such advantage in their advertising. Further, alternative designs are available and in use by other manufacturers. Finally, Plaintiffs' product configuration and trade dress does not decrease production costs and instead increases the costs of manufacturing Plaintiffs' products. Consequently, Plaintiffs' product configuration and trade dress are non-functional.

      (b)    <u>Plaintiffs' Square End Cap has Acquired Secondary Meaning Owing to Its Long and Exclusive Use and Consumer Recognition of It as a Source Identifier</u>

Plaintiffs' square end cap marker products have been sold continuously in the United States since at least 1999. DARLAND DECL., at ¶ 33. The markers are now sold in 214 different colors. *Id*. at ¶ 34. Plaintiffs' sales of square end cap products have grown from 17,280 units in 2000 to over 225,000 units in 2007. *Id*. at ¶ 35. The significant growth of Plaintiffs' sales in the United States demonstrates that Plaintiffs' trade dress has acquired secondary meaning among the relevant consuming public.

Plaintiffs' square end cap marker products have been continual and exclusive to Plaintiffs for 10 years in the United States. DARLAND DECL., at ¶ 36. In conversations with art distributors, store owners and end users of Plaintiffs' markers, these customers regularly refer to the Plaintiffs' marker as the one that is squarish compared to other markers Plaintiffs sell, as well as others in the market. *Id*. at ¶ 37.

When Plaintiffs' markers are on display in stores, they are shown so as to showcase the square end cap of the marker for easy recognition. DARLAND DECL., at ¶ 38. Exhibit A to the Darland Declaration is a cover of Plaintiffs' advertising brochure from 2000 shows that Plaintiffs have promoted the square shape in this manner since they first were sold in the

United States.  *Id*. at ¶ 39.  Exhibit B is a cover of the 2007 edition of the brochure similarly showing the COPIC line.  *Id*. at ¶ 40.

Further evidence of the acquired distinctiveness of Plaintiffs' trade dress appears in Exhibit C to the Darland Declaration, which is the cover and an inside page from BMW's 2001 X5 product catalog.  *Id*. at ¶ 41.  In the exhibit, BMW uses a photo of Plaintiffs' products showing the distinctive shape of the marker end cap.  *Id*.  This exhibit shows that BMW understood Plaintiffs' markers depicted in the picture to be recognizable by the readers of the BMW advertising.  *Id*.  The view shown of Plaintiffs' products also shows that BMW considered the squarish cross-section with indented square end caps to be distinctive features of Plaintiffs' products.  *Id*.

The wholesale dollar volume of sales of Plaintiffs' products from 2000 through 2007, shows an approximately tenfold increase.  DARLAND DECL., at ¶ 7.  Further, the number of retail outlets in the U.S. selling Plaintiffs' products has increased nearly 20 times between 2000 and 2007.  *Id*. at ¶ 8.  Plaintiffs' advertising expenditures have also seen substantial growth during this time.  *Id*.

Letters submitted to the U.S. Trademark Office from two retailers and a user of Plaintiffs' products also demonstrate the acquired distinctiveness of Plaintiffs' trade dress. MURPHY DECL., at ¶ 8.  The retailers, The Duck Store at University of Oregon and Wet Paint Inc. of St. Paul Minnesota, both attest to the distinctiveness of the shape of Plaintiffs' markers.  *Id*.  The retailers also point out that customers know Plaintiffs' products by that trade dress and that the trade dress is recognized in the marker trade as distinguishing Plaintiffs' products from those of other companies.  *Id*.  The writer of the Wet Paint Inc. letter also points out that, on the telephone with customers, Plaintiffs' products are identified

by their distinctive shape. *Id*. Nancy Pobanz, an artist and user of Plaintiffs' products, says that she identifies Plaintiffs' products by their configuration, which she describes in her letter, and regards that configuration as identifying the markers as Plaintiffs' goods and not those of any other company. *Id*.

The foregoing demonstrates that Plaintiffs' trade dress has been used continually and exclusively by Plaintiffs in the United States for much more than five years, which creates a presumption of acquired distinctiveness. Moreover, the evidence shows that Plaintiffs' product configuration has been showcased in Plaintiffs' advertising; that advertising, retail outlets and Plaintiffs' success in resulting sales have grown substantially since 2000; that the relevant market recognizes and identifies Plaintiffs' products by its trade dress; and that Plaintiffs' trade dress has acquired distinctiveness in the United States marker industry. Accordingly, Plaintiffs' trade dress has acquired secondary meaning identifying Plaintiffs as the source of the products.

> (c)    <u>Defendants TOUCH Product Configuration is Likely to Cause Confusion Because it is Nearly Identical to Plaintiff's Product Configuration and Trade Dress</u>

The above analysis regarding the likelihood of confusion between Plaintiffs' registered trademark and Defendants' marker configuration applies equally to Plaintiffs' unfair competition claim. *See, e.g., CytoSport*, 617 F.Supp.2d at 1070 (using the same likelihood of confusion analysis for both trademark infringement claim and trade dress infringement claim). Accordingly, as discussed above, there is a likelihood of confusion between Plaintiffs' product configuration and trade dress and Defendants' marker configuration.

(d)    Plaintiffs are Likely to Succeed on Their Federal Unfair Competition
Claim

Plaintiffs' product configurations are nonfunctional and Plaintiff's square end cap configuration has acquired secondary meaning.  The product configuration and trade dress identifies the source and origin of markers under 15 U.S.C. § 1125(a).  Defendants' use of Plaintiffs' product configuration and trade dress in connection with the sale of marker products is likely to cause consumer confusion.  As a result, Plaintiffs are likely to succeed on the merits of their unfair competition claim.

**C.    Plaintiffs Have and Will Continue to Suffer Irreparable Harm Due to Lost Sales, Loss of Goodwill, Price Erosion, and Lost Opportunities to Sell Other Goods**

As mentioned above, courts in the Ninth Circuit have found a presumption of irreparable harm in a trademark infringement action when a likelihood of success on the merits is shown.  *See Marlyn Nutraceuticals*, 571 F.3d at 876-877.  Therefore, having shown a likelihood of success on the merits in its trademark infringement claim, irreparable harm may be presumed.  Even without this presumption, however, Defendants' actions to date make out a substantial case for irreparable harm.

Here, Defendants have begun selling their confusingly-similar product configuration in the U.S.  MURPHY DECL., at ¶¶ 6 and 7.  In July, Defendants exhibited their confusingly-similar product configuration at the Anime Expo trade show in Los Angeles, California. DARLAND DECL., at ¶ 18.  As a result, Plaintiffs' sales at the trade show were significantly reduced from prior years.  *Id*. at ¶ 42.  Additionally, customers at the trade show were confused between Plaintiffs' and Defendants' products.  *Id*.  Defendants now have their products offered through at least half a dozen on-line distributors.  As Defendants continue to invade the U.S. market with their confusingly-similar product configuration, Plaintiffs ability

to control their business reputation is reduced and Plaintiffs' sales and goodwill will also be reduced.

Moreover, Defendants are likely to cause price erosion by selling their TOUCH markers at approximately half the cost of Plaintiffs' markers. Prior to Defendants' introduction of the TOUCH markers at issue, Plaintiffs' COPIC markers rarely sold for less than five dollars. DARLAND DECL., at ¶ 43. By contrast, Defendants are selling their TOUCH markers for as low as two dollars. *Id*. at ¶ 44. As Defendants continue to invade the U.S. market with their lower-quality markers, price erosion is the inevitable result. Further, at the conclusion of this case, Plaintiffs will likely have difficulty compensating for this price erosion without significant customer backlash and lost sales. Thus, Plaintiffs are likely to suffer irreversible price erosion during the pendency of this suit if Defendants are not enjoined.

Additionally, purchasers of Plaintiffs' markers frequently buy other, related items at the time of purchase. DARLAND DECL., at ¶ 45. Therefore, the loss of each marker sale translates to the loss of related items, such as more markers in different colors, replacement ink, replacement nibs, air brush systems, and even paper, each of which items Plaintiffs' sell in conjunction with their COPIC line. *Id*. As such, the losses attributable to Defendant's infringement include these convoyed sales.

Initial analysis indicates that Defendants' TOUCH markers are of lower manufacturing quality than Plaintiffs' markers. For example, the end caps on Defendants' markers exhibit a much looser fit with the body of the marker. DARLAND DECL., at ¶ 46. Tight engagement of the end caps with the body of a marker is what keeps the marker ink from evaporating. *Id*. Consequently, Defendants' markers are likely to have a shorter

lifetime than Plaintiffs'. Therefore, customers purchasing Defendants' markers believing them to be Plaintiffs' will associate the reduced lifetime of the markers with Plaintiffs and thus the goodwill that Plaintiffs have spent many years establishing in association with their products will be reduced.

Defendants are selling lower quality markers at a reduced price, causing irreversible price erosion, lost sales, and loss of goodwill associated with Plaintiffs' product configuration and trade dress. Consequently, Plaintiffs have suffered irreparable harm from Defendants' actions and will continue to suffer irreparable harm if Defendants are not restrained by the Court.

**D.    The Balance of Equities Favors Plaintiffs Over Defendants Because Defendants Cannot Complain of Hardships They Brought Upon Themselves**

In assessing the propriety of issuing a preliminary injunction, "the court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *CytoSport*, 617 F.Supp.2d at 1064-1065. "When considering the balance of equities, courts will not shy away from issuing preliminary injunctive relief, where to do so would be to aid a second comer who has sought to trade upon the efforts and good will of the first comer." *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F.Supp.2d 1271, 1281 (C.D.Cal. 2008).

As the trademark owner, the damage to Plaintiffs from having Defendants confusingly similar product configuration on the market in the U.S. is significant and irreparable. *See, e.g.*, *CytoSport*, 617 F.Supp.2d at 1081 (the damage from the defendant's unauthorized use of a confusingly similar mark and trade dress is "significant and irreparable"). Plaintiffs will not be able to easily recover the goodwill lost due to

Defendants' infringing sales during the pendency of this case and will probably not be able to recover their price point after an extended period of price erosion. As customers are already being confused by Defendants' presence in the U.S. market, Plaintiffs can reasonably expect further confusion and harm to their goodwill from Defendants' infringing activities, especially in view of the inferior quality of Defendants' markers.

Conversely, Defendants' are the classic second-comer, having intentionally altered their product for sale in the U.S. market knowing of Plaintiffs' claim to its distinctive product configuration. Defendants will only suffer minimal damage if the preliminary injunction issues because they will only be enjoined from selling a single line of products, the square-bodied and square end capped TOUCH markers that have only been recently introduced. *See, e.g.*, *CytoSport*, 617 F.Supp.2d at 1081 (finding equities favor injunction where the defendants will not be stopped from pursuing ordinary business activities, only from selling infringing products). Presumably Defendants can easily switch back to the version 1 TOUCH design, and probably still have the tooling available for such a switch.

Moreover, Defendants had actual and constructive knowledge of Plaintiffs' product configuration and trade dress prior to entering the U.S. market owing to the ongoing dispute over the product configuration of the prior TOUCH version in Europe, as well as Plaintiffs' U.S. trademark application. Thus, any harm to Defendants is discounted by the fact that Defendants brought the injury upon themselves. *See, e.g.*, *Moroccanoil*, 590 F.Supp.2d at 1282 (finding that the balance of equities favors the plaintiff when the defendant brought the injury on themselves by adopting a confusingly similar mark in the face of actual and constructive knowledge of the plaintiff's claim to the mark).

Plaintiffs have and will continue to suffer significant hardship in lost sales and damage to their business reputation as a result of Defendants' activities.  Defendants on the other hand cannot complain of any harm which they brought on themselves.  Consequently, the balance of equities weighs heavily in favor of issuance of the preliminary injunction.

**E.      Trademark Law Protects the Public from Confusion and Thus the Public Interest Favors Granting Relief**

"It is well established that trademark law protects not only the private interests of the trademark owner but also the public's interest in not being confused by the infringing products." *Phillip Morris USA Inc. v. Shalabi*, 352 F.Supp.2d 1067, 1075 (C.D.Cal.2004) (*citing Inwood Labs., Inc. v. Ives Labs. Inc.*, 456 U.S. 844, 854 n. 14, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982)).  "In trademark infringement cases, the public interest is served when an injunction would protect the right of the public not to be deceived or confused."  *Resource Lenders, Inc. v. Source Solutions, Inc.*, 404 F.Supp.2d 1232, 1249 -1250 (E.D.Cal. 2005).

As discussed above, consumers have been and are likely to continue to be confused by Defendants' use of a confusingly similar product configuration to Plaintiffs'.

Because this is a trademark infringement action, the general public interest is best served if Defendants infringing activities are enjoined.  Further, the interest of Plaintiff's and Defendants' customers is best served if Defendants' activities are enjoined.  Consequently, the public interest weighs in favor of issuance of the preliminary injunction.

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

**F.**      **The Court Should Exercise Its Discretion and Issue a Preliminary Injunction to Protect Plaintiffs and the Public from Further Infringement and Unfair Competition**

The Court has discretion to issue a preliminary injunction based on Plaintiffs' likelihood of success on the merits, the likelihood of irreparable harm to Plaintiffs, the balance of equities, and the public interest.

Plaintiffs have demonstrated likelihood of success on their trademark infringement and unfair competition claims. Further, Plaintiffs have demonstrated irreparable harm due to Defendants' activities, that the balance of equities weighs strongly in favor of Plaintiffs, and that the public interest weighs in favor of an injunction against Defendants' activities. Consequently, the Court should issue a preliminary injunction.

## IV.  CONCLUSION

Plaintiffs product configuration and trade dress, and associated goodwill, are substantial assets of Plaintiffs' businesses. Defendants have purposefully entered the U.S. market with a product configuration that copies Plaintiffs' in order to confuse consumers as to the source of their marker products. Therefore, the Court should exercise its discretion to issue a preliminary injunction by granting Plaintiffs' motion.

Respectfully submitted,


___/Hillary A. Brooks_____
Hillary A. Brooks, OSB No. 012138
MARGER JOHNSON & McCOLLOM, P.C.
210 SW Morrison Street, Ste. 400
Portland, Oregon 97204
Telephone: (503) 222-3613
Facsimile: (503) 274-4622

**Attorney for Plaintiffs**


MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I served a copy of the foregoing **MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** on:

Mark Garfinkel, Esq.
General Counsel
ShinHan USA
133 South Oakhurst Drive
Beverly Hills, CA 90212

Brenna Legaard
Dennis E. Stenzel
Chernoff, Vilhauer, McClung & Stenzel, LLP
601 SW Second Avenue
Suite 1600
Portland, Oregon 97204-3157

Christopher R. Ambrose, Esq.
Ambrose Law Group LLC
200 Buddha Building
312 NW 10th Avenue
Portland, Oregon 97209

by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to Defendant's last-known address and deposited in the U.S. mail at Portland, Oregon on the date set forth below.

Dated this 27th day of October, 2009

By: ___s/Kris Roché_____
        Kris Roché

MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION