**Alexander C. Johnson, Jr.**, Oregon State Bar No. 782588
alex@techlaw.com
**Hillary A. Brooks**, Oregon State Bar No. 012138
hillary@techlaw.com
MARGER JOHNSON & McCOLLOM, P.C.
210 SW Morrison Street, Ste. 400
Portland, Oregon  97204
Phone: (503) 222-3613
Fax:    (503) 274-4622

**Attorneys for Plaintiffs**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **TOO MARKER PRODUCTS, INC.**, a Japanese corporation, and **IMAGINATION INTERNATIONAL, INC.**, an Oregon corporation,<br><br>                                  Plaintiffs,<br><br>v.<br><br>**SHINHAN ART MATERIALS, INC.**, a Korean corporation, **SHINHAN USA, C2F, INC.**, an Oregon corporation, and **BONGKEUN HAN**, an individual,<br>                                  Defendants. | Case No. CV-09-1013-PK<br><br>**DECLARATION OF JOHN DARLAND IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

<u>**DECLARATION OF JOHN DARLAND IN**</u>
<u>**SUPPORT OF MOTION FOR SUMMARY JUDGMENT**</u>

I, John Darland, hereby declare under penalty of perjury:

      1.    I am the Vice President of Sales and Marketing for Plaintiff Imagination International, Inc.  I am personally knowledgeable regarding the subject matter stated herein and make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

2. Prior to Too Marker's involvement with Imagination International, Inc. ("III"), COPIC markers had little visibility in the U.S., other than a loyal following familiar with the COPIC markers from experiences in Japan.

3. To build familiarity, III employees spent the first four years on the road, engaging in face-to-face meetings with potential customers in the business, art, and education fields to introduce them to the product and train them in its use. III still regularly attends tradeshows for retailers, and seeks out concentrations of potential end users to inform them about the products it offers and their use.

4. This significant investment in education, training, and travel has helped III develop the U.S. market for the COPIC marker and is largely responsible for the manner in which the product has taken off in the U.S. Further, it has educated the U.S. art market to the concept of a quality marker.

5. Today, the product enjoys a substantial and growing customer base of artists, hobbyists, and others who use the markers.

6. Plaintiffs' sales of products bearing the square-bodied product configuration have grown from 17,280 units in year 2000 to over 225,000 units in 2007.

7. The wholesale dollar volume of sales of Plaintiffs' products from 2000 through 2007, shows an approximately tenfold increase.

8. The number of retail outlets in the U.S. selling Plaintiffs' products has increased nearly 20 times between 2000 and 2007. Plaintiffs' advertising expenditures have also seen substantial growth during this time.

9. Too Marker and III attend trade shows throughout the U.S., Europe and Japan to show the latest product offerings.

10. For many years, Too Marker has been a regular exhibitor at the Anime Expo, an important convention for Anime and Manga artists that represents a rapidly growing segment of the art marker industry.

11. Familiar with Too Marker's success with the COPIC line in Japan, Shinhan, a Korean Company, created the TOUCH marker in an effort to copy the COPIC markers, albeit a lower-quality copy.

12. Unlike Too Marker, which set about building brand loyalty in its target market, Shinhan seeks out distributors, generally those carrying COPIC markers, in an effort to undercut the Too Marker price and reach Too Marker's customer base.

13. Defendant Shinhan is now attending the same conventions as Plaintiffs and requesting adjacent booths.

14. Shinhan has been so successful in its copying of both Too Marker's product and marketing strategy that customers at trade shows have attempted to return TOUCH markers to Too Marker after purchasing them from Shinhan and being dissatisfied with their performance.

15. Too Marker and III have also been asked about the "cheaper COPIC line", the "black COPIC line", etc.; comments which make it clear that the speaker believes the TOUCH marker is a cheaper COPIC marker.

16. The TOUCH line has an ill-fitting cap which results in dried-up ink and a reduced product lifetime.

17. Because Defendants markers are low quality, they can now be sold in the U.S. for approximately half of the price of Plaintiffs' markers.

18. During the first week of July 2009, Defendants displayed their square-bodied TOUCH markers at Anime Expo, a trade show, in Los Angeles, California.

19. Plaintiffs did not authorize Defendants to import and sell square-bodied markers in the United States or to display square-bodied markers at trade shows in the U.S.

20. Plaintiff Too Marker manufactures its COPIC line of marker products in Japan and sells them to various retail outlets in the United States through Plaintiff III, as well as directly to consumers.

21. Defendants manufacture their TOUCH line of marker products in Korea and sell them to various retail outlets in the United States, including Defendant C2F, as well as directly to consumers.

22. Both Plaintiffs and Defendants offer their respective marker products through the internet.

23. Both Plaintiffs and Defendants have offered their respective marker products for sale through trade shows in the U.S.

24. At the Anime Expo in June 2009, a customer purchased TOUCH markers from Defendants' booth. The customer came to Plaintiffs' booth and asked to return the markers for a refund. Several other attendees also expressed confusion between Plaintiffs' booth and Defendants' booth at the show.

25. When presented with one of Defendants' markers and one of Plaintiffs' markers, showing the sides without labels, Plaintiffs' customers have indicated that they could not tell which marker originated with which company.

26. Some of Plaintiffs' customers have asked if Plaintiffs are now selling a low-cost, lower-quality line (referring to the TOUCH markers) because of the near-identity of the product configurations.

27. Plaintiffs' COPIC marker products sell for approximately five dollars per marker, with twelve-packs of markers selling for approximately sixty dollars.

28. Plaintiffs and Defendants are offering the same products.

29. Neopiko and Prismacolor, among many others, sell markers that have circular and oval shapes.

30. Several manufacturers, including Crayola, sell markers having a triangular shape.

31. Although Plaintiffs advertise their products extensively, Plaintiffs have not touted any essential utilitarian advantages of their marker configuration and end cap design.

32. While Plaintiffs have noted that the square bodies of their markers are resistant to rolling off of a work surface, this is a result of the square body alone and does not result from any of the remaining features of Plaintiffs' product configuration or trade dress. Any such advantage in the square body is only present when the markers are not in use as markers, and is incidental to the use of such markers

33. Plaintiffs' marker products have been sold continuously in the United States since at least 1999.

34. Plaintiffs' products bearing Plaintiffs' product configuration are now sold in 214 different colors.

35. Plaintiffs' sales of products bearing Plaintiffs' product configuration have grown from 17,280 units in 2000 to over 225,000 units in 2007.

36. Plaintiffs' square end cap marker products have been continual and exclusive to Plaintiffs for 10 years in the United States.

37. In conversations with art distributors, store owners and end users of Plaintiffs' markers, these customers regularly refer to the Plaintiffs' marker as the one that is squarish compared to other markers Plaintiffs sell, as well as others in the market.

38. When Plaintiffs' markers are on display in stores, they are shown so as to showcase the square end cap of the marker for easy recognition.

39. Exhibit A is a true and correct copy of a cover of Plaintiffs' advertising brochure from 2000.

40. Exhibit B is a true and correct copy of the cover of the 2007 edition of the brochure.

41. Exhibit C is a true and correct copy of the cover and an inside page from BMW's 2001 X5 product catalog.

42. Plaintiffs' sales at the 2009 Anime Expo were significantly reduced from prior years. Additionally, customers at the trade show were confused between Plaintiffs' and Defendants' products.

43. Prior to Defendants' introduction of the TOUCH markers at issue, Plaintiffs' COPIC markers rarely sold for less than five dollars.

44. In some cases, Defendants are selling their TOUCH markers for as low as two dollars.

45. Purchasers of Plaintiffs' markers frequently buy other, related items at the time of purchase. Therefore, the loss of each marker sale translates to the loss of related items, such as more markers in different colors, replacement ink, replacement nibs, air brush

systems, and even paper, each of which items Plaintiffs' sell in conjunction with their COPIC line.

46.     Initial analysis indicates that Defendants' TOUCH markers are of lower manufacturing quality than Plaintiffs' markers. For example, the end caps on Defendants' markers exhibit a much looser fit with the body of the marker. Tight engagement of the end caps with the body of a marker is what keeps the marker ink from evaporating.

I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: October 26, 2009

_____
John Darland

## **CERTIFICATE OF SERVICE**

I hereby certify that I served a copy of the foregoing **DECLARATION OF JOHN DARLAND IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** on:

Mark Garfinkel, Esq.
General Counsel
ShinHan USA
133 South Oakhurst Drive
Beverly Hills, CA 90212

Brenna Legaard
Dennis E. Stenzel
Chernoff, Vilhauer, McClung & Stenzel, LLP
601 SW Second Avenue
Suite 1600
Portland, Oregon 97204-3157

Christopher R. Ambrose, Esq.
Ambrose Law Group LLC
200 Buddha Building
312 NW 10th Avenue
Portland, Oregon 97209

by mailing a copy thereof in a sealed, first-class postage prepaid envelope, addressed to Defendant's last-known address and deposited in the U.S. mail at Portland, Oregon on the date set forth below.

Dated this 27th day of October, 2009

By: ___s/Kris Roché_____
    Kris Roché