**Brenna K. Legaard, OSB No. 00165**
E-mail:  brenna@chernofflaw.com
**Susan D. Pitchford, OSB No. 98091**
E-mail:  sdp@chernofflaw.com
**CHERNOFF, VILHAUER, McCLUNG & STENZEL, LLP**
601 SW Second Avenue, Suite 1600
Portland, OR  97204
Telephone:  (503) 227-5631
Fax:  (503) 228-4373

      Attorneys for Defendants Shinhan Art Materials, Inc.,
      Shinhan USA, LLC, and C2F Inc.


### UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON


| | |
|---|---|
| **TOO MARKER PRODUCTS, INC.,** a Japanese corporation, and **IMAGINATION INTERNATIONAL, INC.,** an Oregon corporation, | Civil Case No. 09-1013-PK |
| | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER** |
|       Plaintiffs, | |
| v. | **TRADEMARK CASE** |
| **SHINHAN ART MATERIALS, INC.,** a Korean corporation, **SHINHAN USA, C2F, INC.,** an Oregon corporation, and **BONGKEUN HAN,** an individual, | |
|       Defendants. | |


### I. INTRODUCTION

      This matter comes before the Court on Too Marker Products, Inc. and Imagination

International, Inc. (hereinafter "Too Marker") Motion for TRO.  As set forth in Too Marker's

motion at Ex. A, this motion was filed in retaliation to Shinhan Art Materials, Inc., Shinhan USA,

LLCand C2F, Inc. (hereinafter "Shinhan")'s request for adequate time to respond to Too Marker's Motion for Preliminary Injunction.

## II. RELEVANT FACTUAL BACKGROUND

Shinhan enjoys as long and as storied a history as Too Marker in the art community, including receiving awards for innovation and quality and enjoying a loyal following. Shinhan and Too Marker are both in the business of selling art products, including square-bodied markers. Shinhan produces a full line of high quality art supplies, including specialty art markers used in the contemporary "anime" art styles which originated in Asia.

Shinhan has marketed square-bodied high quality art markers in the U.S. under the TOUCH trademark since August of 2004. Declaration of Inkap Song (hereinafter "Song Dec.") at ¶ 6. Two versions of the marker have been sold in the U.S.: the 2004 version and the 2007 version. *Id.* at ¶ 5-6. Photographs of the 2004 and 2007 versions are attached to the Declaration of Brenna K. Legaard (hereinafter "Legaard Dec.") at Ex.1. Both versions are black. Song Dec. at ¶ 5. Both versions have square bodies with rounded corners, and both versions have tapered caps. *Id.* The 2004 version included a broader color band at the base of one cap and had a sticker at the top of the cap designating color, while the 2007 version has a narrow contrasting color band at the base of one cap and a plastic insert in the cap tips designating color which is visible from all angles. *Id.*, *see also* Ex. 2. Those are the only differences. Their overall commercial impressions are nearly identical. Plaintiffs seek to enjoin both the 2007 and 2004 versions.

From 2004 until the present, TOUCH markers have been marketed in the U.S. by Charm Art, Inc. Song Dec. at ¶ 2. Since 2004, Mr. Inkap Song of Charm Art has shown the markers at trade shows and sold them to specialty art supply retailers. Song Dec. *Passim.* At least since 2007, and likely since 2004, these vendors at these shows and retailers also sold COPIC markers

side by side with TOUCH markers.  Song Dec. ¶ 3, 7-9; Ex. 1.  Shinhan's marker sales have

increased in 2008 and 2009, as Shinhan's years of effort to build a market for its products have

borne fruit. Song Decl. Ex. 1.  Sales show appearances have become more frequent, and more

retailers are adding TOUCH markers to their offerings.  *Id.*  However, the conduct about which

plaintiffs complain and which they seek to enjoin—selling a square bodied art marker—began on

August 24, 2004, over five years ago, regardless of how recently plaintiffs admit to finally

noticing it.

Too Marker sells a line of markers, including the COPIC original, COPIC WIDE, the

COPIC SKETCH, and the COPIC CIAO.  The SKETCH and CIAO markers are cheaper than the

COPIC original.  All Too Markers' markers currently sold are off-white, but Too Marker

apparently made and perhaps sold a square black tenth anniversary marker at some point.

Plaintiffs' Memorandum in Support of Motion for Preliminary Injunction, Fig. 1.

Both parties' markers are expensive by ordinary marker standards, retailing for $6.00 to

$6.50.  Legaard Dec. ¶ 6, Ex. 5. They are refillable, have a tip at each end, and come in dozens

and dozens of colors.  They are used by artists and art students who are very particular about

their art supplies.  Entire websites are devoted to discussing these and other brands of art markers.

The TOUCH marker's configuration is dictated largely by function.  Users of these

markers often draw on angled drawing tables rather than on flat surfaces, and it is very important

that the markers not roll when they are put down.  Second Dec. of Steven Berman at ¶ 5

("Second Berman Dec.").  A square shape with rounded corners does not roll, and fits

comfortably in the hand.  Tapered caps can be removed more easily.  Second Berman Dec. ¶ 6.

The markers have a wide wedge shaped tip on one end and a narrow tip on the other, and the

contrasting color band permits users to identify which tip is which when the marker is capped

and the side with the marking is turned away from the user. Second Berman Dec. ¶ 7. The 2004 version relied on stickers to indicate marker ink color. The stickers were expensive and labor intensive to apply during manufacturing, and the sticker at the end of the marker cap was not visible when not facing the user. The plastic color insert adopted in the 2007 version is visible from all angles. Second Berman Dec. ¶ 8.

The specialty art supply market is fairly small, consisting of a few dozen retailers, and a few shows each year. Retailers tend to sell competing products from a variety of companies. It is a small commercial universe in which it is relatively easy to keep abreast of competitors' products. Second Berman Dec. ¶ 9.

## III. ARGUMENT

### A.    Since 2004, The Status Quo Ante Litem Has Been Unrestrained Sales Of TOUCH Markers

It is well established that the purpose of a TRO or preliminary injunction is to preserve the status quo pending a final resolution of the dispute. *Sierra Forest Legacy v. Rey*. 577 F.3d 1015, 1023 (9th Cir. 2009). Plaintiffs have themselves adopted this formulation. Pl. Mot. for TRO at 4 (docket #18).

The status quo in this case, dating back to 2004, is Shinhan's unimpeded nationwide sale of black square-bodied markers. Song Dec. ¶ 6, ex. 1. No objection had been voiced until shortly before the filing of this suit. Plaintiffs seek to enjoin square bodied markers. Their claim for relief does not appear to be limited to the 2007 TOUCH marker, but even if it were somehow limited to the 2007 TOUCH marker, those markers were introduced into the U.S. in late February, 2007, and were available for more than two years before this suit was filed. Song Dec. ¶ 6.

Shinhan does not dispute that the "status quo," for the purposes of a TRO or preliminary injunction, is the "last, uncontested status which preceded the pending controversy." *Marlyn Nutraceuticals, Inc. v. Mucos Pharman GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009). However, contrary to plaintiff's assertion, the status quo in this case is 5 years of sales of the accused product and more than 2 years of the latest design. Song Dec. ¶ 6. When sales have been ongoing for years unimpeded, and the only change, if any, is an increase in market share, the "status quo" to be preserved is "one that permits unhindered" sales. *Stuhlbarg Intl. Sales Co. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001). Indeed, the *Stuhlbarg* court went so far as to find that forbidding sales of a product that had been in the market for some time caused such irreparable harm to the seller that it issued an injunction *specifically to permit those sales to take place*. *Id*. That is, not only did the *Stuhlbarg* court reject plaintiffs' reasoning in the present case, it took active steps to protect a seller in Shinhan's position from the plaintiffs' attempts to restrict its sales.

> Where no *new* harm is imminent, and where no compelling reason is apparent, the district court was not required to issue a preliminary injunction against a practice which has continued unchallenged for several years.

*Oakland Tribune Inc. v. The Chronicle Publishing Company*, 762 F.2d 1374, 1377 (9th Cir. 1985) (emphasis added). Because the standards for TROs and preliminary injunctions are the same, and because the relief plaintiffs seek would disturb, and not preserve the status quo, this motion for a TRO should be denied.

**B.    Plaintiffs Are Unlikely To Succeed On The Merits Of Any Of Their Trade Dress Claims**

**1.    The Features Of Too Marker's Marker Configuration Are Functional And Therefore Unprotectable**

"[It] is not the purpose of unfair competition law, under the guise of either consumer protection or the protection of business goodwill, to implement a policy of encouraging innovative designs by protecting them once designed." *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009, 1012 (9th Cir. 1999) (quoting *Duraco Products, Inc. v. Joy Plastic Enterprises, Ltd.* 40 F.3d 1431, 1446-47 (3d Cir. 1994)).  Trademark law promotes "competition by protecting a firm's reputation" not by inhibiting "legitimate competition by allowing a producer to control a useful product feature." *Qualitex Co. v. Jacobson Products Co., Inc.* 514 U.S. 159, 164 (1995).  Even if Shinhan did intentionally copy aspects of the COPIC marker design, and even if consumers do recognize those features as source indicators, Shinhan would have done nothing wrong, because the relevant aspects of the design are functional. Shinhan has a "*fundamental right to compete through imitation of a competitor's product,* which right can only be *temporarily* denied by the patent or copyright laws." *Tie Tech, Inc. v. Kinedyne Corporation*, 296 F.3d 778, 785 (9th Cir. 2002) (internal quotations omitted, emphasis supplied by the court). Thus, Plaintiffs do "not have rights under trade dress law to compel [Shinhan] to resort to alternative designs which have a different set of advantages and disadvantages and disadvantages" than Plaintiff's design. *Leatherman*, 199 F.3d at 1014, N. 7.

A product's physical details "may be protected under the trademark laws only if they are non-functional." *Clamp Mfg. Co. v. Enco Mf. Co.*, 870 F.2d 512, 515 (9th Cir. 1989). Regarding the unregistered trade dress, the Plaintiff "has the burden to establish the nonfunctionality of the alleged trade dress features." *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 32 (2001). Plaintiffs' registration creates a rebuttable presumption the registered configuration is valid and, therefore, non-functional. *Tie Tech, Inc. v. Kinedyne Corporation*, 296 F.3d 778, 782 (9th Cir. 2002). This presumption places the burden on Shinhan to demonstrate the functionality

of the product configuration, and thus the invalidity of the registration. *Id.* If Shinhan can demonstrate through a combination of law and fact that the mark is invalid, the evidentiary bubble bursts. *Id.* at 783 (holding in view of undisputed facts showing functionality, plaintiff could not survive Summary Judgment). The registration then "loses evidentiary significance." *Id.*

Plaintiffs' square bodied end cap is plainly functional. Plaintiff makes much of the fact that its markers have "tight fitting caps" and asserts this fit is a key distinction of quality between Plaintiffs' markers and Shinhan's. Darland Dec. ¶ 46. Plaintiff's markers have a square cross section. In order to achieve any semblance of a tight fit between the marker and the cap, common sense dictates the cross section of the cap must substantially conform to the cross section of the marker.[1] Thus, the squarish cross sectional cap yields the undisputed utilitarian advantage of preventing the ink in the maker from drying out too quickly. The alleged trade dress is functional and not protectable under the Lanham Act.

Plaintiff's registered product configuration consists of a marker having four elements: (1) a squarish cross sectional shape (2) with rounded ends in which (3) terminal portions of both end caps of the marker are indented relative to the body of the marker and (4) a band, which indicates the placement of a contrasting color, is integrally formed in the body of the marker at the juncture of the end cap and body. Each of these elements yields an independent utilitarian advantage and is therefore a functional feature.

As Plaintiffs acknowledge in their advertising and in their brief, "the square body of the marker can prevent the marker from rolling off a desk when not in use." Pl. Memo in Supp. of PI, Doc. No. 8 at 24. Plaintiffs argue this is not a functional feature of the square shape because it "is only one feature" of the product configuration and because the feature "relates to the product

---

[1] Shinhan would rather provide the court with direct evidence of this and other factual points critical to its legal theories instead of mere attorney argument, but to do so would require additional time for discovery.

when not in use." *Id*. Neither of these explanations is relevant to the functionality analysis. Regarding the former, "it is semantic trickery to say there still some sort of 'over all appearance' which is non-functional." *Tie Tech*, 296 F.3d at 786 (quoting *Leatherman Tool Group Inc.  v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999)). As to the latter argument, Too Marker seems to be asserting, without evidentiary support or legal authority, that for a feature of a marker to be functional, it must operate while the marker is being used to transmit ink from an internal reservoir onto some other medium. Indeed, it may be that a marker which has been temporarily set aside is still "in use" if it is likely to be picked up again shortly.  This legal posturing certainly does not overcome Plaintiff's own admission that the squarish shape provides the utilitarian advantage of preventing the marker from rolling.

The rounded ends of the squarish cross sectional shape also serve a functional purpose. The only alternative to rounded ends would presumably be ninety degree angles and such a configuration would likely prove to be uncomfortable to a user gripping the marker for an extended period of time. The colored band shows a user which end of the marker the narrower nib is located at regardless of the angle from which the marker is being viewed, and the indented cap allows one cap to be temporarily mounted to the distal end of the other cap when the marker is in use. Thus the rounded ends, colored band, and indented caps yield the utilitarian advantages of increased user comfort, ease of nib identification, and cap storage. These features are functional and not protectable under any section of the Lanham Act or under common law trademark law.

### 2.    Plaintiffs Cannot Establish Secondary Meaning In Its Trade Dress

In order to receive trade dress protection under either section of the Lanham Act or the common law, plaintiffs must establish the design of its COPIC marker line has a secondary

meaning in the minds of a substantial number of the purchasing public. *Wal-Mart Stores, Inc. v. Samara Brother, Inc.*, 592 U.S. 205, 216 (2000); *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985) (en banc). "The trade dress of a product … attains secondary meaning when the purchasing public associates the dress with a particular source." *Clicks Billiards v. Sixshooters, Inc.*, 251 F.3d 1252, 1262 (9th Cir. 2001) (quoting *Fuddruckers, Inc. v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 843 (9th Cir. 1987)). Moreover, plaintiffs must make that show that its product configuration had that secondary meaning as of the time defendants entered the market in 2004.  *Levi Strauss*, 778 F.2d at 1358.

Secondary meaning is a question of fact. *Japan Telecom, Inc. v. Japan Telecom America Inc.*, 287 F.3d 866, 873 (9th Cir. 2001) (citing *Clicks Billiards*, 251 F.3d at 1262). Evidence of secondary meaning must show the *purchasing public* associates the asserted product configuration trade dress exclusively with a particular source of the product. Too Marker provides virtually no evidence regarding the consumer, and no timely evidence whatsoever. With one exception, discussed below, Plaintiff relies entirely on two declarations, from one of its own employees and one of its distributors. PL Memo in Supp. of PI, Doc. No. 8 at 27-29. This is not enough. See *Filipino Yellow Pages Inc. v. Asian Journal Publications, Inc.*, 198 F.3d 1143, 1152 (9th Cir. 1999) (finding declaration by founder of plaintiff company relating to supposed confusion among unidentified customers lacked foundation and regardless would be "insufficient to establish secondary meaning"); *Japan Telecom*, 287 F.3d at 870 (observing secondary meaning requires mental recognition by the purchasing public and holding 6 declarations by business owners, not members of the purchasing public, were insufficient to establish secondary meaning); *Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995) (declarations from employees and wholesalers had "little probative

value regarding the assessment of consumer perception."); *Art Attacks Ink, LLC v. MGA Entertainment Inc.*, 581 F.3d 1138, 1146 (9th Cir. 2009) (holding evidence of advertising insufficient to establish secondary meaning without buttressing evidence showing the advertising was effective in creating an association between the product and its source).

The single piece of evidence regarding actual consumer perception of Plaintiff's product configuration is the letter dated September 10, 2008 from Nancy Pobanz, "an artist and user of Plaintiff's products," submitted to the Patent and Trademark Office during prosecution of Plaintiff's trademark in 2008.[2] However, to establish a likelihood of success on the merits of its trademark and trade dress claims, Too Marker must not only show that it is likely its asserted product configuration trade dress acts as a source identifier to consumers, but also that this association was established in the minds of the purchasing public as of the time Shinhan entered the U.S. market in 2004. *Levi Strauss*, 778 F.2d at 1358 ("Strauss was required to prove that the tab as used on shirts had acquired secondary meaning by 1976, when Blue Bell began using a protruding label on shirts.").  See also *Global Manufacture Group, LLC v. Gadget Universe.com*, 417 F.Supp.2d 1161, 1171 ("a plaintiff must show its product acquired this meaning *before* the defendant introduced its competing product.").  Thus, the 2008 letter from Ms. Pobanz, along with plaintiff's conclusory statements as to sales growth from 2000-2007 and increase in advertising expenditures from 2000-2007, the 2007 product brochure, and the remaining 2008 letters written to the Patent and Trademark Office, are all irrelevant in determining what, if any, association existed in the minds of the marker buying public between plaintiff's marker configuration and the source of the markers in 2004.

---

[2] The letters to the PTO, including Ms. Pobanz's, address only Plaintiff's registered product configuration. They makes no mention whatsoever of the square end-cap trade dress.

Plaintiffs claim that BMW's 2001 X5 catalog includes a picture of COPIC markers, because BMW believed that its purchasers recognize COPIC markers by their shapes, and somehow also concluded that association with COPIC markers would help it sell cars. Shinhan notes that no declaration from anyone at BMW is included in any of Too Marker's submissions. It is substantially more likely that BMW used the image because the markers are colorful, and the catalog touts the range of color options available to BMW purchasers. At the very least, BMW's inclusion of a picture of COPIC markers in its 2001 X5 product catalog is amenable to reasonable interpretations that have nothing to do with any consumer recognition of square markers, and this advertisement cannot be considered evidence of plaintiffs' claims of secondary meaning without further investigation by Shinhan.

Too Marker has not come close to meeting its burden of establishing secondary meaning in either its product configuration or its trade dress. Therefore it cannot show a likelihood of success on the merits of its trade dress infringement claims and the motions for a temporary restraining order and for a preliminary injunction should be denied.

### 3.    Plaintiffs' Claims Are Barred By Laches

Shinhan first introduced its 2004 square-bodied TOUCH marker into the U.S. in August of 2004. Song Dec. ¶ 6. Plaintiff introduced the 2007 version in late February 2007. *Id.* Therefore, Plaintiffs waited 5 years from the first allegedly infringing conduct to file this suit.

When a suit is filed outside of the most closely analogous state-law limitations period, a presumption of laches attaches. *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836 (9th Cir. 2002). Oregon requires that tort actions be brought within two years. ORS 12.110(1); *see Tillamook Country Smoker, Inc. v. Tillamook County Creamery Association,* 465 F.3d 1102, 1108 (9th Cir. 2002) (applying presumption of laches after two years of delay).

Therefore, Plaintiffs have already exceeded the period for which a presumption of laches attaches for 2007 TOUCH marker. They have more than doubled that period for the 2004 square-bodied marker.

Plaintiffs appear to argue that Shinhan's design change between the 2004 TOUCH and 2007 TOUCH versions somehow saves them from the application of laches. They claim not to have noticed the 2007 TOUCH before the summer of 2009, approximately 18 months after the product hit the market, and they claim that the change amounts to an "evolution" of Shinhan's design toward the COPIC design. However, the nature of the conduct plaintiff's complain about is fatal to all of these excuses. As this Court found in *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 311 F.Supp.2d 1023, 1032 (D. Or. 2004), *aff'd, Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d 1102 (9th Cir. 2006):

> When, as here, the party resisting the application of laches has asserted an infringement claim against the party invoking laches, the court should focus on the conduct which the claimant contends infringes. The underlying rationale for laches is to prevent a party from sleeping on its rights; accordingly, a party cannot sue claiming conduct X is infringement when conduct X has been occurring for many years with the party's knowledge.

Just as the core of Creamery's infringement claim was Smoker's use of the trade name "Tillamook Country Smoker" to sell smoked meats, the core of plaintiffs' claim is Shinhan's use of a square bodied marker, and the 2004 TOUCH was a square bodied marker. Plaintiffs do not deny knowing about the 2004 TOUCH—indeed, they sued a Shinhan distributor in Europe over that version of the marker in 2007. Even if they deny knowing about the 2004 TOUCH as they deny knowing of the 2007 TOUCH, laches does not require proof of actual knowledge—the clock starts when the senior user knew or should have known about the junior user. *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 952 (9th Cir. 2001). Moreover, given the relatively small art supply

market, the number of trade shows the parties both attended, and the number of sales outlets selling both lines, defendants should at the very least be permitted discovery into any alleged ignorance.

This delay has been harmful to Shinhan because in the meantime, Shinhan has built a following and considerable customer good will in the United States based on roll-resistant square-bodied markers. This has resulted in steadily increasing sales. Song Dec. Ex. 1. The increase in sales has required investment in advertising, trade show attendance, and tooling for the production of expanding numbers of markers for sale in the US. Consumers purchasing TOUCH markers have come to expect that they will, in the words of Plaintiffs' website, "resist rolling" due to their "square shape." Legaard Dec. Ex 4; *see also* Second Berman Dec. ¶ 5. It will prejudice Shinhan to deprive it of its right to provide a functional feature that it has spent five years teaching its customers to value and expect.

Had Plaintiffs raised their concerns with Shinhan five years ago, it might have been possible for Shinhan to select a different shape, whether roll-resistant or not, and convince new customers to accept that design. After such a long delay, however, existing customer loyalty will be taxed by the change. For these reasons, laches will bar recovery, and Plaintiffs cannot demonstrate a likelihood of success on the merits.

### 4. Too Marker Is Unlikely To Succeed On The Merits Of Its Unfair Competition Claim

Too Marker's claims under 15 U.S.C. §1125 et seq. and its common law claim both arise from its alleged exclusive rights in a square-bodied marker configuration. For the same analysis and reasons enumerated above, Too Marker will not prevail on its claim of unfair business practice or its common law claim.

**5.      Too Marker Is Unlikely To Succeed On The Merits On Its Patent Claims**

The parties have already conferred and Plaintiffs have indicated that they will not oppose a motion to dismiss all of their patent-based claims and Bongkeun Han, the patentee individually, upon delivery of a Covenant Not to Sue on the subject patent executed by all Defendants. Shinhan is collecting the required signatures and expects to deliver the Covenant shortly.

**C.      Shinhan Would Be More Harmed By An Injunction Than Plaintiffs Will Be Harmed By Continued Competition, And Issuing An Injunction Would Be Inconsistent With Public Policy**

In order to prevail on a preliminary injunction, the moving party must demonstrate the balance of equities tips in his favor, and that the injunction is in the public interest. *United States v. Nutri-Oncology, Inc*. 982 F.2d 394, 397 (9th Cir.1992). In the trademark context, courts often define the public interest at stake as the right of the public not to be deceived or confused.  See e.g. *Moroccanoil, Inc. v. Moroccan Gold, LLC*, 590 F.Supp.2d 1271, 1282 (C.D.Cal.2008). However, here there is no evidence of confusion beyond conclusory, heresay statements by the principle and distributor of one plaintiff.  These are unlikely to withstand scrutiny when Shinhan has an opportunity to conduct discovery.

In trademark and trade dress case on appeal to the Seventh Circuit, *Storck v. Nabisco, Inc*., the Court acknowledged consumers should not be confused, but found that the public had a greater interest in competition, where plaintiffs had a very weak showing of confusion:

> Nabisco and Storck informed us at oral argument that to this day no one has conducted the surveys customary in trademark cases, showing the packaging or product to consumers and asking: "Who makes this?" or "Are these two products made by the same firm?" Perhaps the packages are confusing after all; we make little of the disclaimer, which few consumers will read.

> But all the district court found - all that it could find on this record - is that Nabisco's packaging uses Storck's mark and that confusion is possible. That is not enough to postpone the introduction of a new product. When deciding whether to grant or withhold

equitable relief a court must give high regard to the interest of the general public, which is a great beneficiary from competition.

Although the benefits of competition do not justify the introduction of products that engender substantial confusion, when the plaintiff's showing is as thin as Storck's the interests of the public carry the day. Damages in trademark cases are hard to measure, but the possibility of compensation offers sufficient protection to a trademark owner, when an injunction bids fair to stifle competition and injure consumers in order to ward off occasional confusion. Even substantial deference to the district court's balancing of the equities cannot save an injunction when the judge overstates the private injury and disregards the public interest in competition.

*Storck v. Nabisco, Inc.*, 59 F.3d 616, 618-619 (7th Cir. 1995) (internal cites omitted).

Similarly here, the Court is presented with a very thin record of confusion: the hearsay statements of an employee and distributor, who do not indicate that they witnessed any of the alleged confusion. It is clear, however, that Shinhan offers a comparable product at a competitive price, something which benefits consumers who are both the design professionals and home hobbyists. See Dec. of Bill Cole at ¶ 8.

Granting Too Markers' injunction would set bad public policy by giving Too Marker a monopoly over functional features. On the other hand, should Too Marker continue to prevent Shinhan and its customers from selling its products, the cost is great. Shinhan has worked hard to enter this market, and its efforts would be undercut just as they are starting to get traction.

Shinhan would "have to remove its product from the market, which would undoubtedly harm the [TOUCH] brand and market position." *Hansen Beverage Co. v. Vital Pharma., Inc*. 2008 WL 5427601, (S.D. Cal. 2008). (Denying preliminary injunction on a product that had been sold for one year, and known to plaintiff for several months, before the motion for injunction was brought). The proposed TRO would simply deny Shinhan's customers the ability to buy any TOUCH markers at all until it was lifted. Any happy customer who wished to introduce a friend to TOUCH markers as a Christmas gift would be simply unable to do so. Old

customers looking to add to their color selection or replace a lost or damaged marker would have to look elsewhere.  And of course, substantial existing inventory would have to be warehoused or destroyed.  Shinhan's "business would essentially end." *Hansen Beverage Co. v. Innovation Ventures, LLC*. 2008 WL 4492644, (S.D. Cal. 2008).  It was precisely for these reasons that the *Stuhlbarg* court found sufficient irreparable harm to *issue* an injunction permitting the plaintiff to continue making sales unimpeded.  *Stuhlbarg* 240 F.3d at 841.

The damage Shinhan will suffer if precluded from manufacturing and selling it TOUCH markers is significant.  It will have to pull and dispose of its current inventory and either retool if it can or be excluded from the market completely.  Ultimately, the requested injunction would preclude Shinhan from engaging in its normal, legal business activities.  In contrast, denying Too Marker's motion simply preserves the status quo as Too Marker has tolerated it since 2004:  with both parties sharing in the same market channels, using functional product designs, and competing on price.

**D.    Too Marker should be Required to Post a Bond in an Amount Adequate to Compensate Shinhan's Losses from Any Injunction**

Rule 65(c) of the Federal Rules of Civil Procedure provides that no preliminary injunction shall issue except:

> upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

The Federal Circuit approved a $400,000,000 bond, where the trial court's parameters used in setting the bond were "potential lost profits, lost market share and associated costs of relaunch" in the event of wrongful enjoinment.  *Sanofi-Synthelabo v. Apotex, Inc.* 470 F.3d 1368, 1385 (Fed. Cir. 2006).  Rule 65(c) gives the district court wide discretion to set the amount of a bond. *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005). The district court is in

the best position to determine the amount and appropriateness of the security required under Fed.R.Civ.P. 65, and its decision is reviewed only for an abuse of discretion. *Id.*

Shinhan believes a bond of not less than $500,000 would be necessary to protect all defendants, including C2F, it from lost profits, lost market share and associated costs of relaunch in the event Shinhan is found "to have been wrongfully enjoined or restrained."

**E.    Shinhan Should Be Permitted To Conduct Adequate Discovery To Respond To The Motion For Preliminary Injunction.**

Shinhan requests a reasonable discovery and hearing schedule, along with an order permitting expedited discovery as needed to prepare for preliminary injunction hearing. Too Marker proffers evidence which is in need of further exploration; such as:

1.  Evidence of Confusion:    Too Marker attempts to offer evidence of confusion in the declaration of John Darland.  Shinhan needs to depose Mr. Darland to determine whether any of this unsubstantiated testimony will withstand scrutiny.  Mr. Darland testifies about customers' attempts to return markers to Too Marker and customer comments, but he does not testify as to any personal knowledge of such incidents, he does not describe personal involvement in any such incident, and he actually describes customers at trade shows returning markers to Too Marker, not to Imagination International.  Mr. Darland works for Imagination International, not Too Marker.  Mr. Darland fails to testify to personal knowledge of the only specific instance of "confusion" described in his declaration.  Darland Decl. at ¶ 24.  Mr. Darland describes comments made to Too Marker and to Imagination International, but provides no detail and no evidence of personal involvement.  Darland Decl. at ¶ 14 – 15.

2.  Advertising Functional Features: When product features are characterized as functional in advertising, they cannot be protectable as "trade dress".  Too Marker acknowledges that,

at a minimum, it has described the square-bodied configuration as functional. Yokoyama Decl. at ¶ 44.  The file history contains the one page of Too Marker's advertising cited by the Trademark Examiner for its description of the advantages of a square profile. Without discovery as to Too Marker's advertising, including its description of color indicators and cap configuration, Shinhan's ability to mount a defense will be compromised.

3. <u>Secondary Meaning of Trade Dress</u>: Too Marker contends that their product configuration has acquired secondary meaning, based in part on BMW's use of a photo of the COPIC markers in a print advertisement. Memo at page 28.  BMW's testimony is not offered.  Instead, Too Marker offers the statements of Duck Store and Wet Paint Inc., both of whom suggest customers recognize COPIC markers as square.  However, if square is functional as Too Marker's advertising states, Too Marker cannot rely on this feature for secondary meaning. Further, as these statements date from 2008, they cannot be used to show secondary meaning at the time Shinhan entered the U.S. market in 2004. Shinhan needs to explore the inconsistencies of this testimony to adequately address Too Marker's contentions.  "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 851, n. 11 (1982).

4. <u>Sales of Black Markers</u>:  Too Marker's briefing features photographs of black COPIC markers side by side with Shinhan's black TOUCH markers and invites the  Court to believe that the parties' products are same color.   However, the COPIC markers currently on the market are off-white, while Shinhan's are black.  Too Marker later

admits that the black markers it has shown the Court are a special marker made for its tenth anniversary, and does not say if the tenth anniversary markers were ever sold in the United States.  Shinhan needs discovery as to whether these markers were ever sold in the United States, or ever sold at all. Shinhan suspects that Too Marker is deliberately attempting to mislead the Court by misrepresenting its trade dress.

5.  <u>Evidence of Harm</u>:  Too Marker complains about price erosion and lost sales, but provide absolutely no evidence of any such phenomena.  Plaintiffs complain that before the introduction of the Shinhan's TOUCH markers, it rarely sold markers for less than five dollars a piece, and that TOUCH markers are less expensive, but provide no evidence whatsoever that they have reduced their prices for any reason.  Too Marker provides no sales figures for after 2007.  Too Marker claim convoyed sales, but again with no evidence.  Unless further discovery substantiates these unsubstantiated allegations, all of this testimony should be disregarded.

Shinhan has been working quickly to draft discovery requests and served them.  As previously stated in Shinhan's Motion for Extension of Time to Respond to the Preliminary Injunction Motion (Docket # 16), Shinhan believes it will need approximately 2 months to conduct the necessary discovery to refute Too Marker's allegations.  If Too Marker is believed, it waited from June, 2009 until October 27, 2009 to file its motion for preliminary injunction.  If Shinhan is correct, Too Marker delayed 5 years after the U.S. launch of the 2004 TOUCH.  In either case, Shinhan does not believe that Too Marker would be harmed by this modest time extension.

## IV. CONCLUSION

Based on the above points and authorities and supporting Declarations, Shinhan

respectfully requests the court deny Too Marker's request for a preliminary injunction on

Shinhan.

DATED:  November 6, 2009

CHERNOFF, VILHAUER, McCLUNG &
    STENZEL, LLP


/s/ Brenna K. Legaard
Brenna K. Legaard, OSB No. 00165
Susan D. Pitchford, OSB No. 98091
Telephone:  (503) 227-5631
Attorneys for Defendants Shinhan Art Materials,
Inc., Shinhan USA, Inc. and C2F Inc.