FILED
OCT 01 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TOO MARKER PRODUCTS, INC. a
Japanese corporation, and
IMAGINATION INTERNATIONAL,
INC., an Oregon corporation,

        Plaintiffs,

CV 09-1013-PK

OPINION AND ORDER

SHINHAN ART MATERIALS, INC., a
Korean corporation, SHINHAN USA,
C2F, INC., an Oregon corporation, and
BONGKEUN HAN, an individual,

        Defendants.

PAPAK, Judge:

    Plaintiffs Too Marker Products, Inc. ("Too Marker"), a marker manufacturer, and

Imagination International, Inc., Too Marker's U.S. distributor, now pursue claims for trademark

Page 1 - OPINION AND ORDER

infringement and unfair competition against defendants Shinhan Art Materials, Inc., and Shinhan U.S.A (collectively "Shinhan"). Additional claims and defendants were previously dismissed in this action. Now before the court are plaintiffs' motion for imposition of sanctions for spoliation of evidence and fraudulent discovery responses (#105), and plaintiffs' motion to compel and motion to unseal declarations (#116). I have examined briefing and heard oral argument on these motions. For the reasons described below, the motions are granted.

## BACKGROUND

After this lawsuit was filed in August, 2009, Shinhan's President and CEO Steven Berman and the CEO of Shinhan's exclusive United States distributor, Dr. Inkap Song, created a consumer confusion survey for customers at a trade shows in Savannah, Georgia which asked, among other questions, whether they were confused between Too Marker's COPIC marker and Shinhan's TOUCH marker. (Berman Decl., #114, ¶¶ 3, 7-11); (Song. Decl., #90, ¶4); (DeJong Decl., #107, Ex. 6,7.) Although Berman ultimately asked Song not to conduct the survey, Song administered the survey. In early October, 2009, Song sent Berman and Mark Garfinkel, Shinhan's corporate counsel, an email summarizing the responses. (DeJong Decl., #107, Ex. 7.) Of the 140 responses, Song characterized 39 as irrelevant, 25 as unfavorable to Shinhan and 76 as favorable to Shinhan. (*Id.* at ¶19). Song also sent Berman the survey questionnaires with consumers' responses. (Berman Decl., #114, ¶¶13, 22). Berman later discarded the survey responses and retained no written copies. (Song. Decl., #90, ¶4); (DeJong Decl., #107, ¶¶12-13); (Berman Decl., #114, ¶23).

Plaintiffs served defendants with requests for production of documents, including surveys concerning square bodied markers and incidents of actual confusion between their markers.

Page 2 - OPINION AND ORDER

(DeJong Decl., #107, Ex. 5.) On December 11, 2009, Shinan responded that Shinhan had not performed any surveys regarding the design of its TOUCH markers and that it had no knowledge of actual consumer confusion between the markers. (*Id.*) Shinhan's general counsel Mark Garfinkel verified those responses under oath. (*Id.*) At the time, however, Garfinkel was aware of the results from the survey, since he was the carbon copy recipient of the email from Song two months earlier which described those results. (*Id.* at Ex. 7.)

In June, 2010, Song revealed the survey results to plaintiffs and plaintiffs informed counsel for defendants. (DeJong Decl., #107, ¶7.) Shinhan's counsel then acknowledged Berman's destruction of the survey responses. (*Id.*) On August 4, 2010, plaintiffs filed a motion for sanctions due to spoilation of evidence. On August 11, 2010, Shinhan produced several redacted emails between Dr. Song and Shinhan concerning the topic of surveys as well as a privilege log identifying the redacted documents as protected by attorney-client privilege. (Pl.'s Memo in Support, #117, Exs. 1,2.) In response to plaintiffs' motion, defendants filed declarations by Shinhan CEO Steven Berman and Shinhan general counsel Mark Garfinkel, both under seal. (Berman Decl,. #114); (Garfinkel Decl., #115).

## DISCUSSION

### I. Plaintiffs' Motions to Compel and Unseal Declarations

Plaintiffs pursue two separate discovery issues. First, they seek to compel defendants to produce emails between Dr. Inkap Song and defendants concerning the topic of surveys because those documents are not privileged under the common interest doctrine of the attorney-client privilege. Second, they seek to unseal the declarations of Steven Berman and Mark Garfinkel filed by defendants in support of their response to plaintiffs' motion for sanctions.

Page 3 - OPINION AND ORDER

## A. Survey Emails

"The attorney-client privilege protects confidential disclosures made by a client to an attorney in order to obtain legal advice, . . . as well as an attorney's advice in response to such disclosures." *United States v. Ruehle*, 583 F.3d 600, 607 (9th Cir. 2009) (citation omitted). An eight-part test determines whether information is covered by the attorney-client privilege:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) unless the protection be waived.

*Id.* The privilege is strictly construed and is "confined within the narrowest possible limits consistent with the logic of its principle." *Id.* (citation omitted). Thus, "[a] party asserting the attorney-client privilege has the burden of establishing the relationship *and* the privileged nature of the communication." *Id.* (citation omitted) (emphasis in original).

The common interest doctrine is not an independent basis for privilege, but rather an exception to the rule on waiver where privileged communications are disclosed to third parties. *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007). Thus, the common interest privilege qualifies the requirement that a communication be made in confidence, and prevents waiver of the privilege to the extent confidential communications are shared between members of a joint defense. *Griffith*, 161 F.R.D. at 692. Since the common interest privilege is an exception to waiver of the attorney-client privilege, "it comes into play only if the communication at issue is privileged in the first instance." *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007).

The doctrine protects communications between an individual and an attorney for another

Page 4 - OPINION AND ORDER

only when the communications are part of an "on-going and joint effort to set up a common defense strategy." *Griffith*, 161 F.R.D. at 692. There need not be actual litigation for the doctrine to apply, the exception does not require a complete unity of interests among the participants, and it may apply even where the parties' interests are adverse in substantial respects. *See Nidec Corp.*, 249 F.R.D. at 578. Another basic requirement of the common interest exception is that the parties must have "a common legal, as opposed to commercial, interest." *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 579 (N.D. Cal. 2007) (quoting *Bank Brussels Lambert v. Credit Lyonnais*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995)). Thus, the exception does not apply to "a joint business strategy which happens to include as one of its elements a concern about litigation." *Bank Brussels Lambert, 160* F.R.D at 447.

Based on my *in camera* review of the allegedly privileged emails, I find that the attorney-client privilege does not attach to these communications. The initial, unprivileged email (SH0257A) was written by Inkap Song, who Shinhan admits is not an employee of Shinhan, and is apparently addressed to Steven Berman (Shinhan CEO) and carbon copied to Mark Garfinkel (Shinhan corporate counsel) and Shinhan executives Chang Won and Bongkeun Han. That email concerns the results from the survey Song conducted at the trade show and possible improvements in the survey design. The allegedly privileged email chain then unfolds as follows. The second email (SH0257) is a response written by Garfinkel addressed to Song, Berman, and copying Won. In that email, Garfinkel discusses the nature of the pending lawsuit, consumers' familiarity with the differences between the COPIC and TOUCH markers, and the appropriate design of a survey to discover whether consumers shopping at art stores are confused and mistakenly choose TOUCH markers instead of COPIC markers because of their similar

Page 5 - OPINION AND ORDER

shapes. The third email (also on SH0257) is a response by Song to Garfinkel and Berman, copying Won, proposing to revise the survey and administer it at another large convention. The fourth email (SH0256) is another message from Song to the same recipients essentially repeating his proposal and seeking approval to proceed. Attached to that email is an updated version of the survey (SH0263) with changes to question #17 concerning consumer confusion. In the fifth email (also on SH0256), Garfinkel replies to Song and Berman, copying Won, rejecting Song's proposal to conduct a new survey. Finally, the sixth email (also on SH 0256) is a terse confirmation by Song to the same recipients.[1]

In briefing, Shinhan characterizes these emails as communications made in confidence by Shinhan executives seeking legal advice from Garfinkel, some of which were made in the presence of Song, a non-employee. My review instead reveals the converse; the active communications are exclusively authored by Song and Garfinkel, and Shinhan executives are passive observers. None of the communications originate from any Shinhan executive and none seeks legal advice from Garfinkel. Thus, these are not communications of the client– Shinhan– shared with a third party with a common legal interest, but rather communications between the attorney and a third party– Song– shared with the client. Consequently, Shinhan's assertion that "[e]veryone included in the communications, including Dr. Song, understood the communications were being made in order for Shinhan's counsel to provide legal advice to the corporation regarding the design and execution of consumer surveys potentially to be used . . . in the present litigation" is inaccurate. (Def.'s Resp., # 126, at 3.) Shinhan has failed to meets its

---

[1] Another email between Berman, Garfinkel, and Won found at the top of SH0267 is not included in this discussion because Dr. Song is not a recipient, and thus, the communication is not within the scope of plaintiffs' current motion.

Page 6 - OPINION AND ORDER

burden to demonstrate one key element of attorney-client privilege, namely that the emails are either communications made by the client (Shinhan) relating to legal advice or by the attorney (Garfinkel) in response to such communications. Since the communications are not privileged in the first place, the common interest doctrine does not apply. Plaintiffs' motion to compel production therefore is granted.

### B. Sealed Declarations

In response to plaintiffs' motion for sanctions, defendants filed two declarations under seal pursuant to paragraph seven of the Stipulated Protective Order in this case. Although neither declaration was marked "Outside Attorneys Only," correspondence between Shinhan and plaintiffs' counsel makes clear that plaintiffs were aware that Shinhan intended to designate the declarations as "Outside Attorneys Only" under paragraph four of the protective order, which permits that designation where the information "contains trade secret information as defined by the law of the State of Oregon, or where the information is proprietary information and the disclosure of that information to non-designated parties and their outside counsel is, in good faith, believed to be harmful to the designating party from a business or competitive point of view." (Stipulated Protective Order, #63, ¶4.) The order provides that any party filing a document under seal in keeping with the order must "make the showing required pursuant to Fed. R. Civ. P. 26 and *Foltz v. State Farm Mutual Automobile Ins. Co.*, 331 F.3d 1122 (9th Cir. 2003), in order to maintain the secrecy of such documents." This standard is consistent with Ninth Circuit case law in the context of non-dispositive motions, which states that a "particularized showing . . . under the 'good cause' standard of Rule 26(c) will 'suffice[] to warrant preserving the secrecy of sealed discovery material attached to nondispositive motions.'" *Kamakan v. City &*

Page 7 - OPINION AND ORDER

*County of Honolulu*, 447 F.3d 1172, 1180 (9th Cir. 2006) (citing *Foltz v. State Farm Mutual Automobile Ins. Co.*, 331 F.3d 1122, 1138 (9th Cir. 2003)). Since the two declarations at issue were filed in relation to a motion for discovery sanctions, a non-dispositive motion, I apply the standard articulated in the protective order. Thus, to keep the declarations under seal Shinhan must make a particularized showing that either: (1) the Berman and Garfinkel declarations contain trade secret information; or (2) each declaration contains proprietary information and Shinhan believes in good faith that disclosure of that information will harm it from a business or competitive point of view.

Shinhan does not assert that the declarations contain trade secrets as defined by Oregon law, but instead argues that they contain proprietary information that would be harmful to Shinhan's commercial interests if revealed to Dr. Song. The Stipulated Protective Order does not define "proprietary information," so I look elsewhere to give meaning to that term. Proprietary information is somewhat circularly defined as: "Information in which the owner has a protectable interest. See TRADE SECRET." Black's Law Dictionary (8th ed. 2004). Consistent with the dictionary's additional reference to trade secret, courts have equated the terms proprietary information and trade secret. *See John Does I-VI v. Yogi,* 110 F.R.D. 629, 632 (D.D.C. 1986), *rev'd in part by Kropinski v. World Plan Executive Council-US*, 853 F.2d 948, 951 (D.C. Cir. 1988) ("In deciding whether to protect proprietary business information under 26(c), courts in this jurisdiction have looked to the definition of trade secrets"). A trade secret, in turn, is defined as:

> A formula, process, device, or other business information that is kept confidential to maintain an advantage over competitors; information — including a formula, pattern, compilation, program, device, method, technique, or process — that (1) derives

Page 8 - OPINION AND ORDER

> independent economic value, actual or potential, from not being generally known or readily ascertainable by others who can obtain economic value from its disclosure or use, and (2) is the subject of reasonable efforts, under the circumstances, to maintain its secrecy.

Black's Law Dictionary (8th ed. 2004). Thus, information is not proprietary merely because it is confidentially held; rather it must also have some additional intellectual attribute – a formula, process, device, or the like– which imbues it with independent economic value.

Consequently, I find that Shinhan's definition of "proprietary information" is much too broad. Shinhan states that proprietary information is "information that is known only to Shinhan and is not otherwise publically available . . . ." (*See* Def.'s Resp., #126, at 7.) Shinhan cites many examples of purportedly proprietary information contained in the declarations: Garfinkel's description of his involvement in the present litigation and the communications concerning the survey conducted by Dr. Song, Garfinkel's legal reasoning behind responses to interrogatories, Berman's descriptions of acrimonious business relationships between Shinhan and Song, Berman's professional opinion of Song, and Berman's reasoning behind certain communications with Song. (*Id.* at 8.) These aspects of the declarations are surely sensitive, but do not constitute proprietary information under the accepted definition described above. Only two paragraphs of the declarations contain proprietary information: those where Berman describes Shinhan's future distribution strategies. (*See* Berman Decl., #114, ¶¶4, 16.) Thus, I conclude that Shinhan has made a particularized showing that these two paragraphs alone contain proprietary information.[2] As it is conceivable that someone could use the distribution information to harm Shinhan's business interests, I agree that Shinhan has met its burden to keep paragraphs four and sixteen of

---

[2]Consequently, I need not address the remainder of Shinhan's arguments concerning the potentially harmful effects of disclosing the other parts of the declarations.

Page 9 - OPINION AND ORDER

the Berman declaration sealed. Nevertheless, those two paragraphs of the Berman declaration discussing distribution can easily be redacted, which is an option contemplated in the Stipulated Protective Order. (Stipulated Protective Order, #63, ¶19) ("Before seeking to maintain protection of documents filed with the Court, a party must assess whether redaction is a viable alternative to complete nondisclosure.") Therefore, plaintiffs' motion to unseal the Berman and Garfinkel declarations is granted, with the exception of paragraphs four and sixteen of the Berman declaration, which defendants may choose to redact.

### C.    Attorney's Fees

Plaintiffs seek attorney's fees incurred in filing these motions pursuant to Fed. R. Civ. P. 37(a)(5)(A). Rule 37 provides that if a motion to compel disclosure or discovery is granted, "the court must, after giving an opportunity to be heard, require the party or deponent whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). Attorney's fees are not justified when any of the following exceptions applies: "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; (ii) the opposing party's nondisclosure, response, or objection was substantially justified; or (iii) other circumstances make an award of expenses unjust." *Id.* Parties' submissions in their responsive memoranda constitute the hearing provided for under Rule 37 and no separate evidentiary hearing is required. *See Persson v Faestel Invest., Inc.* (N.D. Ill. 1980).

Here, I have grant plaintiffs' motion to compel in full, and grant plaintiffs' motion to unseal two declarations with only the exception of two paragraphs. However, I disagree with

Page 10 - OPINION AND ORDER

plaintiffs that none of the exceptions described in Rule 37(a)(5)(A) apply. Although I found for plaintiffs in both motions, defendants' arguments supporting non-disclosure were substantially justified. In the first motion the emails involved Shinhan's corporate counsel, and thus could potentially have been protected by the attorney-client privilege. In the second motion, the declarations discussed some confidential information which may have been considered proprietary information under the stipulated protective order. Thus, each party is responsible for its own attorney's fees and expenses, and plaintiffs' request for attorney's fees in connection with its motion to compel and unseal declarations is denied.

## II.   Plaintiffs' Motion for Sanctions for Spoilation of Evidence and Fraudulent Discovery Responses

Plaintiffs also move for sanctions in response to defendants' spoilation of evidence and fraudulent discovery responses. Shinan agrees that its conduct in destroying the surveys is sanctionable, but resists plaintiffs' suggested sanction of a default judgment or a finding of likelihood of confusion. Instead, Shinhan argues that an adverse inference instruction concerning actual confusion is the more appropriate sanction. Plaintiffs and defendants have both submitted proposed adverse inference instructions at the request of this court.

"A federal trial court has the inherent discretionary power to make appropriate evidentiary rulings in response to the destruction or spoilation of relevant evidence." *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (citing *Unigard v. Lakewood*, 982 F.2d 363, 368 (9th Cir. 1982)). That power includes exclusion of evidence and permitting a jury to draw "an adverse inference from the destruction or spoilation against the party or witness responsible for that behavior." *Id.* The Ninth Circuit has explained the rationales behind an adverse inference

Page 11 - OPINION AND ORDER

instruction:

> The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. . . . The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial.

*Akiona v. United States*, 938 F.2d 158, 161 (9th Cir. 1991) (quoting *Welsh v. United States*, 844 F.2d 1239, 1246 (6th Cir. 1988)). While a finding of "bad faith" is not required for a trial court to order an adverse inference instruction against a party destroying evidence, such a finding certainly justifies an adverse inference instruction. *Glover*, 6 F.3d at 1329. But, an adverse inference instruction also may be given solely on basis that the party had notice that the destroyed evidence was potentially relevant to the litigation. *Akiona*, 938 F.2d at 161.

Here, I find that an adverse inference instruction is warranted because both Shinhan's general counsel and Shinhan's CEO had knowledge of the destroyed survey's potential relevance to the litigation. I cannot conclude, however, that either acted in bad faith in destroying the survey responses or failing to disclosing the survey in response to production requests. *See Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (a party demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order).

Starting in August, 2009, Shinhan CEO Steven Berman helped Shinhan manage its response to the litigation. (Berman Decl., #114, ¶3.) Berman also spoke with Dr. Song about the allegations against Shinhan and about the potential for Song to perform a survey at the trade show in Savannah, Georgia in October, 2009, that would explore one of the issues in the

litigation: whether there was any confusion between TOUCH and COPIC markers. (*Id.* at ¶7.) Moreover, Berman knew that Song completed the survey at the Savannah show and actually received the survey responses in the mail from Song. (*Id.* at ¶¶16-19, 22). Thus, Berman knew that survey responses were potentially relevant to the litigation.

Berman's knowledge of the survey's relevance to this litigation does not, however, demonstrate his bad faith. Berman asserts that he discarded the copies of the survey responses because, after learning more about the legal requirements of a trademark survey, he concluded that problems with the survey questions and methodology rendered the responses meaningless. (Berman Decl., #114, ¶23.) Further, Berman states that he believed he was entitled to dispose of the responses because he did not consider them to be company documents subject to discovery and because he thought their evidentiary value was flawed. (*Id.* at ¶24). Consequently, I do not find that Berman destroyed the survey results in bad faith.

Similarly, Shinhan general counsel Mark Garfinkel knew that the survey responses were relevant to the litigation, but did not exhibit bad faith either destroying the survey responses or in verifying Shinhan's interrogatory responses which did not reveal the existence of the survey.[3] Garfinkel received the email from Dr. Song summarizing the survey responses concerning the

---

[3] In reaching the determination that Shinhan generally, and Garfinkel in particular, did not act in bad faith, I have considered not only the declarations and exhibits submitted by the parties, but also the allegedly privileged email communications submitted for my *in camera* review which were the subject of plaintiffs' motion to compel. In one email (Bates Number SH 0256), Shinhan counsel Mark Garfinkel declines Dr. Song's offer to conduct a second survey, instructing Song that the initial trade show survey was done "for marketing purposes only and not for the litigation" and warning Song not to discuss the results of the survey or its implications. Although I am concerned about the disingenuous nature of Garfinkel's comment, I nonetheless cannot find evidence of bad faith in the destruction of the survey responses, especially since Berman alone decided to discard the responses (Garfinkel Decl., #115, ¶5) and Garfinkel was not involved in the details of the survey design (Garfinkel Decl., #115, ¶3.)

Page 13 - OPINION AND ORDER

issue of confusion between the TOUCH and COPIC markers. (DeJong Decl., #107, Ex. 7.) Thus, he knew of the survey and its potential relevance. Nevertheless, Garfinkel interpreted plaintiffs' interrogatories to be focused on evidence relating to Shinhan's initial design of the TOUCH marker. (Garfinkel Decl., #115, ¶10.) His stated interpretation is at least plausible and is consistent with Shinhan's responses to the interrogatories. (*See Id.* at ¶9) ("ANSWER: Neither Shinhan USA or Shinhan Art Materials Inc. has performed any studies or surveys . . . in regard to the design of the TOUCH marker products.") Garfinkel also stated that although he should have acknowledged the survey conducted by Song, he still believes that he did not need to disclose the survey results in response to plaintiffs' interrogatory. (*Id.* at ¶14.) Thus, there is insufficient evidence here of Garfinkel's bad faith in his interrogatory answers.

While I find that an adverse inference instruction is warranted based on Shinhan's knowing destruction of potentially relevant evidence and while I instructed the parties to submit proposed adverse inference instructions for my review, I decline to formulate the precise instruction appropriate here. This is not a case in which I have full consent of the parties, so I leave the drafting of an adverse inference instruction to the district judge if and when the matter proceeds trial.

"Under its 'inherent powers,' a district court may also award sanctions in the form of attorneys' fees against a party or counsel who acts in 'bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Leon v. IDX Sys. Corp.*, 464 F.3d 951, 961 (9th Cir. 2006) (quoting *Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997)). Before awarding attorney's fees as sanctions, the court must make an express finding that the sanctioned party's behavior constituted or was tantamount to bad faith. *Id.* Here, as described above, I do not find that

Page 14 - OPINION AND ORDER

Shinhan acted in bad faith. Therefore, plaintiffs may not recover their attorney's fees incurred in bringing their motion for sanctions.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for imposition of sanctions for spoliation of evidence and fraudulent discovery responses (#105) is granted and the adverse inference instruction described herein shall be given at trial. Additionally, plaintiffs' motion to compel (#116) is granted and defendants shall produce unredacted versions of the email communications and attachments between defendants and Dr. Inkap Song bearing Bates Numbers SH0256-58, SH0263-68, and SH0270-71. Defendants may redact the email communication not involving Dr. Song on the top of Bates Number SH0267, as that email was not a within the scope of plaintiffs' motion. Plaintiffs' motion to unseal declarations (#116) is granted and defendants should refile both declarations not under seal, with the exception of paragraphs four and sixteen, which defendants may redact.

Dated this 1st day of October, 2010.

_____
Honorable Paul Papak
United States Magistrate Judge