FILED

OCT 0 1 2010

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TOO MARKER PRODUCTS, INC. a
Japanese corporation, and
IMAGINATION INTERNATIONAL,
INC., an Oregon corporation,

        Plaintiffs,

                                   CV09-1013-PK

                                   FINDINGS AND

v.                                  RECOMMENDATION

SHINHAN ART MATERIALS, INC., a
Korean corporation, SHINHAN USA,
C2F, INC., an Oregon corporation, and
BONGKEUN HAN, an individual,

        Defendants.

_____

PAPAK, Judge:

      Plaintiffs Too Marker Products, Inc., a marker manufacturer, and Imagination

International, Inc., Too Marker's U.S. distributor, now pursue claims for trademark infringement

Page 1 - FINDINGS AND RECOMMENDATION

and unfair competition against defendants Shinhan Art Materials, Inc., and Shinhan U.S.A (collectively "Shinhan").[1]  Additional claims and defendants were previously dismissed in this action.  Defendants' motion for summary partial judgment (#49), plaintiffs' motion to strike the declaration of Bill Cole in support of defendants' motion for summary judgment (#78), and plaintiffs' cross motion for partial summary judgment (#81) are now before the court.  I have examined briefing and heard oral argument on these motions.  For the reasons described below, the motions should be denied.

## BACKGROUND

Plaintiff Too Marker makes the COPIC line of square-bodied markers.  (Compl., #1, at 4.)  Too Marker owns United States Trademark Registration No. 3,629,617 for the product configuration of its square-bodied marker.  *Id.*  Too Marker distributes its markers in the United States through plaintiff Imagination International, Inc.  *Id.*

Defendant Shinhan Art Materials also makes square-bodied markers, which it calls the TOUCH line.  *Id.*  C2F, Inc., formerly a defendant in this action, distributes TOUCH markers in the United States.  *Id.* at 5.  In July, 2009, plaintiffs learned that defendants were selling the TOUCH line in the United States.  *Id.* at 4.  Plaintiffs allege that the TOUCH markers have substantially the same product configuration as plaintiffs' COPIC markers.  *Id.*  In August, 2009, plaintiffs sent a letter to C2F asking that it stop importing, distributing, advertising and selling TOUCH markers in the United States because they created a likelihood of confusion with Too Marker's COPIC line.  (Compl. Ex. B.)  Defendant Shinhan USA responded in a letter refusing to

---

[1] For ease of reference, I use the identifier "Too Marker" to refer collectively to plaintiffs Too Marker Products, Inc. and Imagination International, Inc.  When referring to one plaintiff individually, I use that plaintiff's full name.

stop sales of the TOUCH markers and stating that Too Marker's COPIC line infringes Shinhan's design patent for the TOUCH line of markers.   (Compl. Ex. C.)

Plaintiffs pursue claims for common law trademark infringement (Count III) and Lanham Act claims for trademark infringement and unfair competition (Counts I and II) against Shinhan Art Materials, and Shinhan USA  (Compl. at. 5-10.)  The complaint alleges that Too Marker Products, Inc. owns a registered trademark for the design configuration of a square-bodied marker and that defendants manufacture, import and sell TOUCH markers, which have a configuration similar to plaintiffs' mark.  *Id.* at 4, 5, 7-10.  The complaint also alleges plaintiffs have established trademark rights in the unregistered trade dress of their square-bodied marker configuration.  *Id.* at 6-7.

**LEGAL STANDARDS**

I.        **Motion to Strike**

"The general rule in the Ninth Circuit is that a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony." *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) (citing *Foster v. Arcata Associates*, 772 F.2d 1453, 1462 (9th Cir.1985), *cert. denied*, 475 U.S. 1048 (1986)).  "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id.*  However, where an affidavit is offered to explain confused deposition testimony or clarify prior testimony, the affidavit and deposition testimony may not be inconsistent. *Id.*; *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir.

1995).  Before striking an affidavit, a district court must make a factual determination that the

contradiction was actually a "sham," created for the purpose of generating a material issue of fact

to preclude summary judgment.  *Id.* at 267.

## II.       Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law."  Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues

exist for trial.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

1995), *cert. denied,* 116 S.Ct. 1261 (1996).  In evaluating a motion for summary judgment, the

district courts of the United States must draw all reasonable inferences in favor of the nonmoving

party, and may neither make credibility determinations nor perform any weighing of the

evidence.  *See, e.g., Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v.

Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000).  On cross-motions for summary

judgment, the court must consider each motion separately to determine whether either party has

met its burden with the facts construed in the light most favorable to the other.  *See* Fed. R. Civ.

P. 56; *see also, e.g., Fair Hous. Council v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

## DISCUSSION

## I.       Plaintiffs' Motion to Strike

Plaintiffs move to strike the declaration of Bill Cole (#52) because it allegedly fails to

comply with the basic requirement that "[a] supporting or opposing affidavit must be made on

personal knowledge . . . ." Fed. R. Civ. P. 56(e)(1). The declaration, dated December 23, 2009,

summarizes Cole's role as the President and CEO of a company selling comic book preservation

supplies and art supplies, explains Cole's evaluation of using various markers, and describes

many features of the COPIC and TOUCH markers. Cole Decl., #52, at 1-3. Plaintiffs contend

that the declaration should be striken under the "sham affidavit" rule because it was not based on

Cole's personal knowledge. Plaintiffs note that Cole testified that the had no input in the

substance of the declaration, (Cole Tr., #79, Attachment 1, 79:17-20, 81:4-7) and Cole's

declaration apparently conflicts with his subsequent deposition in this case taken on May 25,

2010.[2] By contrast, defendants assert that Cole's deposition testimony does not necessarily

conflict with his declaration, (Def.'s Opp. to P.'s Mot. to Strike, #95, 5-12) and that Cole

possessed the personal knowledge of the markers described in the declaration by virtue of his

role as president and CEO of his company, which sold a number of different types of markers.

(Cole Tr., #79, Attachment 1, 7:6-8; 15:18-24).

      Plaintiffs here fail to demonstrate that the Cole declaration is a sham affidavit,

created for the purpose of generating a material issue of fact to survive summary judgment.

Thus, their motion to strike should be denied. In this case, defendants submitted Cole's

declaration months *before* Cole's deposition occurred, precluding the possibility that defendants

---

    [2] For example, Cole declares that he evaluates the quality of the marker products his
company carries, which involves becoming familiar with the product features and "often using
the products myself." (Cole Decl., #52, at 5.) Cole also refers several times to particular marker
features and their effect on the marker user (Cole Decl., #52, at 6-9). However, Cole later
testified that he does not use the COPIC markers (Cole Tr., Attachment 1 to #79, 98:13-16;
104:7-9.)

manufactured the declaration merely to contradict Cole's testimony and fashion a material issue of fact. Thus, even if the declaration substantively conflicts with the deposition, the declaration cannot be considered a "sham" in the sense described by relevant case law. Even the cases cited by plaintiff involve a conflicting declaration created after deposition testimony, which is not the case here. *See, e.g., Noga v. Costco Wholesale Corp.*, 583 F.Supp.2d 1245, 1254-55 (D. Or. 2008) (court refused to consider portions of plaintiff's declaration contradicting prior deposition testimony). Consequently, the degree to which Cole's declaration actually contradicts with his later deposition testimony is irrelevant to this motion to strike.[3]

## II.      Defendants' Motion for Summary Judgment

Defendant Shinhan moves for dismissal of counts I (Federal Trademark Infringement), II (Federal Unfair Competition), and III (Common Law Trademark Infringement) in plaintiff's complaint and an order directing the Commissioner of Patents and Trademarks to cancel U.S. Trademark Registration No. 3,629,617 pursuant to 15 U.S.C. § 1119.

### A.      Federal Trademark Infringement

To succeed on a trademark claims under the Lanham Act, a plaintiff must satisfy three elements: (1) nonfunctionality, (2) distinctiveness, and (3) likelihood of confusion. *Talking Rain Bev. Co. v. S. Beach Bev. Co.*, 349 F.3d 601, 603 (9th Cir. 2003). Shinhan's motion focuses on the first element, asserting that there is no material question of fact concerning the functionality of Too Marker's product configuration.

As the Ninth Circuit has explained, "[t]he relationship between trademark protection

---

[3] Those discrepancies are, however, relevant in determining whether material issues of fact exist for the jury, and are thus addressed below in analyzing defendants' motion for summary judgment.

and functionality is well established: The physical details and design of a product may be protected under the trademark laws only if they are nonfunctional ...." *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 782 (9th Cir. 2002) (internal quotations omitted). Thus, registration of a trademark is prohibited if the product configuration is functional. *See* 15 U.S.C. § 1052(e)(5) (no protection for a mark which "comprises any matter that, as a whole, is functional"). Consistent with this requirement, defendants in a trademark infringement action may raise functionality as an affirmative defense. 15 U.S.C. § 1115(b)(8).

A registered trademark, however, is presumptively valid. 15 U.S.C. §1115(a). In other words, registration provides prima facie evidence of the trademark's validity and the registrant's right to exclusive use of the mark. *Id.*; *Tie Tech*, 296 F.3d at 782 (noting that cases often refer interchangeably to "prima facie evidence" of validity and "presumption of validity"). Thus, the plaintiff in an infringement action with a registered mark shifts the burden of production to the defendant to provide evidence of functionality. *Tie Tech*, 296 F.3d at 783. Court generally view functionally as "an intensely factual issue." *Id.* Nevertheless, if "the defendant can demonstrate through law, undisputed facts, or a combination thereof that the mark is invalid, the evidentiary bubble bursts and the plaintiff cannot survive summary judgment." *Id.* That is, "[i]n the face of sufficient and undisputed facts demonstrating functionality . . . the registration loses its evidentiary significance." *Id.*

The functionality doctrine has two distinct rationales, both aiming to enhance free competition. First, it promotes free competition by ensuring that utility patent law remains the only legal source of exclusive rights in utilitarian features. *See Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 164–65 (1995) ("The functionality doctrine prevents trademark law, which

seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time . . . . If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity)"). Second, the functionality bar on trademarks preserves competition by allowing competitors to freely copy features that they need to compete effectively. *See* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:63 (4th ed. 1998) (citing *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159 (1995).

  The Supreme Court's traditional test of functionality declares that "[i]n general terms a product feature is functional if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850, n. 10, 72 L. Ed. 2d 606, 102 S. Ct. 2182 (1982); *see Traffix Devices v. Mktg. Displays*, 532 U.S. 23 (2001). Although the Supreme Court has several times analyzed functionality since *Inwood*, the traditional test remains. In *Qualitex*, the Court observed that a functional feature is one the "exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." 514 U.S. at 165. But, as the Court's later decision in *Traffix* explained, "[t]he *Qualitex* decision did not purport to displace this traditional [*Inwood*] rule . . . It is proper to inquire into a 'significant non-reputation-related disadvantage' in cases of aesthetic functionality, the question involved in *Qualitex*." *Traffix*, 532 U.S. at 33.

  The parties expend considerable effort attempting to construe the particular meaning

Page 8 - FINDINGS AND RECOMMENDATION

of the operative phrase in the Supreme Court's traditional test of functionality: whether the product feature "affects the cost or quality of the article." Defendants contend that "affects [ ] quality" means affects the product's usefulness. *See Qualitex,* 514 U.S. at 164 (describing the functionality doctrine as preventing a producer from controlling a "useful product feature.")  In contrast, plaintiffs argue that the "quality" test is not synonymous with whether the feature makes the product more or less "useful." *See Qualitex*, 514 U.S. at 165 (describing the use of some color as important in making dry cleaning press pads, while finding that the particular color design was non-functional); *see also In re Morton Norwich Products, Inc.,* 671 F.2d 1332, 1338 (C.C.P.A. 1982) (not equating functionality with mere utility).  I decline to parse the meaning of the Supreme Court's traditional definition of functionality from *Inwood* and instead rely on the Ninth Circuit's specific four-factor test for functionality and subsequent Ninth Circuit case law applying those factors.

The Ninth Circuit weighs four factors in determining whether a product feature is functional: "(1) whether advertising touts the utilitarian advantages of the design, (2) whether the particular design results from a comparatively simple or inexpensive method of manufacture, (3) whether the design yields a utilitarian advantage and (4) whether alternative designs are available." *Talking Rain Bev. Co. v. S. Beach Bev. Co.*, 349 F.3d 601, 603 (9th Cir. 2003); *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1006 (9th Cir. 1998).  No single factor is dispositive and all should be weighed collectively.  *Disc Golf,* 158 F.3d at 1006.

Recent cases have given additional guidance in applying the fourth factor, the existence of alternative designs.  In *Traffix*, the Supreme Court  recognized that once functionality is established, "there is no need . . . to engage . . . in speculation about other design

possibilities . . . ." *Traffix*, 532 U.S. at 33.  In *Talking Rain*, the Ninth Circuit interpreted this language to mean that "the existence of alternative designs cannot negate a trademark's functionality." *Talking Rain*, 349 F.3d at 603.  But, *Talking Rain* reiterated that the existence of alternative designs is still a valid consideration amongst other factors in considering whether a feature is functional: "the existence of alternative designs may indicate whether the trademark itself embodies functional or merely ornamental aspects of the product." *Id.*

The court's treatment of alternative designs in *Talking Rain* is instructive in understanding how evidence of alternative designs influences functionality analysis.  There, plaintiff Talking Rain, a water bottle manufacturer, sued a competitor for infringement of its trademarked bottle shape and the competitor moved for summary judgment claiming that the bottle's shape was functional.  *Talking Rain*, 349 F.3d at 602.  The district court granted summary judgment, and the plaintiff appealed.  The Ninth Circuit applied the first three of the four factors proposed in *Disc Golf*, finding no material dispute that Talking Rain touted its bottle's utilitarian shape in advertising, considered manufacturing advantages when designing the bottle's shape, and admitted that the bottle design yielded a utilitarian advantage to the consumer. *Id.* at 604.  The court then noted that Talking Rain relied solely on the argument that it's bottle design was just one of a number of possible alternative designs for beverage bottles.  *Id.* Invoking *Traffix*, the court reasoned that "the mere existence of alternatives does not render a product nonfunctional" and affirmed the lower court's grant of summary judgment.  *Id.*  Thus, *Talking Rain* stands for the proposition that when all three *Disc Golf* factors except alternative designs unequivocally demonstrate that a particular product feature is functional, a factual dispute concerning the existence of alternative designs alone will not save the plaintiff from

Page 10 - FINDINGS AND RECOMMENDATION

summary judgment.

Finally, one overriding principle is crucial in applying the four factor test to analyze the functionality of a product design. That is, "when the thing claimed as trade dress or a trademark consists of a combination of individual design features, then it is the functionality of the overall combination that controls." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 7:70 (4th ed. 1998). Professor McCarthy explains the prevailing view that "an overall design combination of individually functional items is protectable because while the pieces are individually functional, this particular combination of those pieces is not functional." *Id.* Consequently, Professor McCarthy suggests a "two step enquiry into the functionality of both the individual features and the overall relationship and arrangement of those features." McCarthy, § 7:70.

Ninth Circuit cases generally follow this two step analysis, but with one important caveat. In *Leatherman Tool Group, Inc. v. Cooper Indus.*, 199 F.3d 1009 (9th Cir. 1999), the Ninth Circuit held that an overall product configuration cannot be a protected trade dress if all its individual features are functional and its overall design is also intended to improve performance. There, plaintiff Leatherman was first to market a multi-function pocket tool, which was later copied almost exactly and marketed by defendant Cooper. *Id.* Leatherman filed an action for trade dress infringement. *Id.* Cooper moved for judgment as a matter of law on the trade dress claim, arguing that Leatherman failed to prove that the entire design of the tool was nonfunctional. *Id.* The district court denied the motion and the jury ultimately found both that the overall appearance of the Leatherman tool was protectable trade dress and that Cooper had infringed that trade dress. *Id.* The Ninth Circuit reversed, holding that the district court erred in

Page 11 - FINDINGS AND RECOMMENDATION

denying Cooper's motion because the overall appearance of Leatherman's tool was not protectable trade dress. *Id.*

In reaching that holding, the *Leatherman* court drew guidance from its previous product configuration decision in *Clamp Manufacturing Co., Inc. v. Enco Manufacturing Co., Inc.*, 870 F.2d 512, 515 (9th Cir. 1989). In *Clamp*, the court cited approvingly to Federal Circuit case law which required an overall product configuration to be completely non-functional, based on the rationale that the "right to copy better working designs would, in due course, be stripped of all meaning if overall functional designs were accorded trademark protection because they included a few arbitrary and nonfunctional features." *Clamp*, 870 F.2d at 516 (quoting *Textron, Inc. v. U.S. Int'l Trade Com*, 753 F.2d 1019, 1025 (Fed. Cir. 1985)). *Clamp* nevertheless upheld the trial court's finding of trade dress infringement under the "clearly erroneous" standard of review where there was evidence only that some of the product's features were non-functional. *Id.* at 517. Consequently, the court in *Leatherman* stopped short of adopting the Federal Circuit rule, holding only that for a plaintiff to establish protectable rights in a product configuration case, "there must be some aspect to the configuration which is nonfunctional . . . ." *Id.* at 1013 n.6.

Applying that standard, the court found that there was no evidence in the trial record indicating that anything about the Leatherman tool's appearance existed for a non-functional purpose. *Id.* at 1013. Rather, the evidence indicated that every physical part of the tool was functional and, moreover, that the tool was in its particular configuration precisely because it worked better in that shape. *Id.* The court then carved out an exception to the general rule permitting trade dress protection for an overall product configuration:

Page 12 - FINDINGS AND RECOMMENDATION

> Leatherman is correct that trade dress must be viewed as a whole, but where the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate "overall appearance" which is non-functional.

*Id. Leatherman* therefore establishes that although a product configuration may be protected even if all of its constituent product features are functional, a product configuration which is both comprised of functional features and is itself entirely functional does not warrant protection. *See Leatherman Tool Group, Inc. v. Cooper Indus.*, 199 F.3d 1009, 1013 (9th Cir. 1999).

Engaging in the two-step inquiry suggested both by Professor McCarthy and *Leatherman*, I begin by analyzing the functionality of individual product features asserted as part of Too Marker's registered product configuration. Too Marker's registered trademark describes a product configuration consisting of: (1) a "squarish cross-sectional shape [having rounded corners];" (2) "terminal portions of both end caps [having flat ends] of the marker [] indented relative to the body of the marker;" and (3) "a band, which indicates the placement of a contrasting color [ ] integrally formed in the body of the marker at the juncture of the end cap and body . . . ." (Mem. in Opp. to Mot. for Partial Summ. Judg., #91, Ex. 6.) Because this product configuration is a registered trademark, a presumption of non-functionality arises, shifting the burden to Shinhan on summary judgment to demonstrate through a combination of undisputed facts and law that the configuration is functional.[4] As described below, I first find that a material factual dispute exists as to the functionality of each product feature in Too Marker's registered

---

[4]Also, as described more fully below, Shinhan's design patent for its TOUCH marker (which contains similar features as Too Marker's COPIC marker) provides additional support to the presumption of non-functionality of Too Marker's registered product configuration. *See Talking Rain*, 349 F.3d at 605 n.3 (design patent for a beverage bottle and cap creates "at most another presumption of non-functionality").

product configuration.  Additionally, I find that Shinhan fails to discharge its burden to show that

the product configuration as a whole is functional. ·

### 1.        Squarish Shape

Two of the four factors support a finding that the squarish shape of the marker is

functional.  First, the parties do not dispute that Too Marker's online advertising of the COPIC

marker states that the marker's "square body profile is roll resistant on working surfaces."

(Legaard Decl., #26, Ex. 3.)  Thus, there is no material issue of fact that Too Marker touts the

utilitarian benefits of the shape of their marker.  Second, since Too Marker concedes in briefing

that the square body resists rolling and that consumers may find this quality desireable (Pl.'s

Suppl. Brief, #41, at 12), I find that as a matter of law the squarish shape of the marker yields a

utilitarian advantage.[5]

By contrast, the other two factors indicate that the shape of the marker is non-

functional.  Too Marker presents uncontradicted evidence that the squarish shape of the marker is

more expensive and difficult to manufacture.  (Yokoyama Decl., #89, ¶¶3-5.)  Additionally,

plaintiffs' adduce ample evidence of alternative designs which resist rolling. (Murphy Decl., #42,

Exs. A, B) (describing 22 alternative marker designs available in the Portland area with various

---

[5] Too Marker contends that several other pieces of evidence create a dispute about the
utility of the marker shape.  First, it cites declarations stating that the exterior features of the
COPIC marker, including the cross-sectional body, distinguish it visually from other markers but
do not affect the quality of the marker or provide any utilitarian advantage. (Yokoyama Decl.,
#89, ¶15). These statements are merely conclusory and do not raise a triable issue of fact.  *See*
Fed. R. Civ. P. 56(e) (a party opposing summary judgment "must set forth specific facts showing
that there is a genuine issue for trial.")  Second, it presents depositions from the marker's designer
that he chose the square design with rounded sides to have a unique shape and to "look different,"
not to resist rolling when placed on angled surface. (Nakagawa Decl., #88, ¶¶3-5.) The purely
decorative intent behind the marker's shape, however, does not detract from the other evidence
establishing the squarish shape resists rolling.

shapes, caps, color designators, tip designators, and mechanisms for ensuring roll resistance); (Pl.

Opp., #91, Ex. 6 , Cole Tr. at 83-85) (deposition testimony concerning alternative marker designs

to prevent rolling). In sum, since only two factors indicate functionality, I find that Shinhan has

not shown that the shape of the marker is functional as a matter of law.

### 2.    Color Band

Although defendants assert that Too Marker's website touts the utility of the

contrasting color band, I find that to be a factual question for trial. The website appears to

identify various nib options by visual reference to the color of the insert which creates the

contrasting color band. (*See* Lyman Decl., #100, Ex. B.) But, no text references the band's

usefulness in distinguishing between nibs. Additionally, the marker is depicted with nibs

exposed and without any caps, whereas the color band is purported to be useful only in

identifying nibs when covered by caps. Thus, viewed in a light most favorable to Too Marker, I

cannot conclude that the website graphic touts the utility the marker's color band in

distinguishing between nibs.

Similarly, Shinhan fails to prove as a matter of law that the color band actually

provides a utilitarian advantage. According to one declaration by a business owner who sells art

supplies, differing colors of plastic inserts at each end of the marker create visible bands at the

junctions between the body and the caps which enable a user to determine which end of the

marker contains the fine nib and which end contains the broad nib when the caps are closed.

(Cole Decl., #52, ¶¶7-9.) Deposition testimony from the same individual, however, states that

aside from partially visible markings identifying the nibs on each end of the marker, there is no

other way to determine which end has the fine and broad nib without opening the caps. (Pl.

Page 15 - FINDINGS AND RECOMMENDATION

Opp., #91, Ex. 2, at 91:6 - 92:19). Moreover, Too Marker's trademark registration's written description stating that the bands indicate "the placement of a contrasting color"– and not identification of the nibs– further complicates the question of whether the bands confer an utilitarian advantage. (*See* Mem. in Opp. to Mot. for Partial Summ. Judg., #91, Ex. 6.) Therefore, a question of fact still exists as to whether the band described in the plaintiffs' trademark registration identifies the different ends of the markers.

Further, the two remaining factors also indicate that Shinhan has not established that the color band is functional. Too Marker presents evidence that the band formed at the juncture between cap and body increases manufacturing efficiency. (Yokoyama Decl., #89, ¶9) ("The band formed in the body of the marker at the juncture of the end cap and body also presents challenges in achieving an airtight seal, because the band is a space between the end cap and the marker body.") Shinhan argues that a physical examination of the COPIC marker, (Lyman Decl., #100, Ex. D) indicates that since gaps exist between the cap and the marker body on both ends (not just on the end with the color band), the band does not impose additional manufacturing costs. (Def.'s Reply, #96, at 19.) The effect of the color band on manufacturing costs is clearly a factual question, not one that can be resolved here as a matter of law. Concerning the last factor, Too Marker presents uncontroverted evidence of alternative designs to identify the differing nib sizes on markers. (Pl. Opp., #91, Ex. 6 , Cole Tr. at 92-95). Thus, my analysis of all four factors suggests that a material dispute still exists over whether the color band is functional.

### 3. Indented and Flat End Cap

Shinhan presents no evidence that Too Marker touted the advantages of the cap design of its COPIC markers. Also, Shinhan does not dispute the existence of alternative designs

for marker end caps. (Murphy Decl., #42, Exs. A, B). Additionally, reasonable inferences from plaintiffs' declarations show that the indented end cap feature increases manufacturing costs. The indented cap requires a two-piece design, where an insert is attached to another piece to form a cap so that the insert is indented relative to the rest of the cap and the marker body. (Yokoyama Decl., #89, ¶6.) This two-piece process creates joints that may permit air intrusion, requiring a special manufacturing method to place the insert and create an airting seal. (*Id.* at 8.) Regarding the remaining factor, Shinhan meets its burden to produce evidence that the indented end caps confer a utilitarian advantage. A declaration by defendant asserts that indented cap design allows one cap to be stored on the other cap during use. (Cole Decl., #52, ¶9). Neither the COPIC trademark registration's failure to mention the utility of the end cap (Dejong Decl., #87, Ex. 6) nor the conclusory assertion of Too Marker's Operating Officer (Yokoyama Decl., #89, ¶15) raise a factual dispute concerning the utility of the end caps. Nevertheless, where three factors suggest the end cap design is non-functional and only one factor, utilitarian advantage, demonstrates functionality, I find that Shinhan does not present sufficient evidence to satisfy its burden to prove as a matter of law that the end cap design is functional.

As the foregoing analysis demonstrates, there is a material dispute concerning whether each individual product feature of Too Marker's product configuration is non-functional. This finding alone satisfies the Ninth Circuit's requirement that "in a product configuration case there must be some aspect to the configuration which is nonfuctional . . . ." *Leatherman*, 199 F.3d at 1013. Nevertheless, I continue on to determine whether Shinhan has shown that Too Marker's overall product configuration is functional.

### 4.    Overall Product Configuration

Analyzing Too Marker's product configuration holistically also demonstrates that the there is at least a material dispute about whether the configuration is nonfunctional.  A declaration from the marker's designer indicate that his objective was to create a marker with a unique shape to differentiate it from existing markers which featured different sized caps on each end. (Nakagawa Decl., #88, ¶3).  To that end, he chose a square design with rounded sides to have a unique shape and to "look different." (*Id.*)  He also chose the same shape for both caps in order to have the caps and body share a consistent, unique shape.  (*Id.* at ¶4.)  In contrast to *Leatherman*, where the product configuration was "designed to result in superior performance," the designer's statements indicate that overall configuration of the marker with a squarish body, color band, and indented cap was designed for visual distinctiveness, not cold functionality.  Thus, I find that Shinhan has also failed to show that Too Marker's overall product configuration is functional as a matter of law.  Consequently, Shinhan's motion for summary judgment should be denied on this claim.

## B.        Federal Unfair Competition  (Count II)

While a registered trademark is presumptively valid, a plaintiff asserting protection for an unregistered trade dress[6] has the burden of proving that the trade dress is non-functional.

---

[6]"Trade dress refers to the total image of a product and may include features such as size, shape, color, color combinations, texture or graphics." *Disc Golf Ass'n v. Champion Discs*, 158 F.3d 1002, 1006 n.3 (9th Cir. 1998) (citing *International Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 822 (9th Cir. 1993)). The Supreme Court explains that when "[t]he design or packaging of a product" acquires a distinctiveness which identifies the product with its manufacturer or source, it acquires secondary meaning as a trade dress and cannot be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods. *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 28 (2001).  Consequently, while the scope of trade dress has been said to exceed that of trademark, the analysis for trade dress and an unregistered trademark under section 43(a) of the Lanham Act is very similar. *Int'l Jensen, Inc. v. Metrosound U.S.A.*, Inc., 4 F.3d 819, 823 (9th Cir. 1993).

Page 18 - FINDINGS AND RECOMMENDATION

15 U.S.C. § 1125(a)(3);  *see Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 29, 121 S. Ct. 1255,

149 L. Ed. 2d 164 (2001).  Too Marker asserts an unregistered trade dress of it's "end cap view"

consisting of the squarish appearance of the marker when displayed with the end cap facing the

customer. (Pl.'s Memo in Opp., #91, at 18.)  Thus, Too Marker bears the burden of proving that a

factual dispute still remains concerning the non-functionality of its unregistered trade dress.

Again, I apply the familiar four factors which indicate functionality in the Ninth

Circuit and determine that a material issue of fact exists concerning the functionality of plaintiffs'

unregistered trade dress.  First, Too Marker presents evidence that it has not touted any feature of

the cap, including its distinctive end cap view.  (Darland Decl., #11, ¶31.)   Additionally, Too

Marker has shown that a number of alternative cap designs exist; this factor also favors Too

Marker.  Further, Too Marker provides evidence that the cap manufacturing process is

complicated by the overall two-piece design of the cap, (Yokoyama Decl., #89, ¶¶6-8), and that a

squarish, non-tapered cap shape presents difficulties in the injection molding process (*Id.* at ¶3.)

This evidence indicates a material factual dispute over whether the square end cap constituting

Too Marker's unregistered trade dress specifically results in manufacturing inefficiencies.  By

contrast, plaintiffs have not met their burden concerning the fourth factor: utilitarian advantage.

Shinhan suggest that the square shape of the cap confers an utilitarian advantage because it

contributes to the roll resistence of the marker.  (Cole Decl., #52, ¶6.)  Too Marker only counters

with the conclusory statement that its cap shape does not affect the quality or utility of the marker

(Yokoyama Decl., #89, ¶15.)  Overall, Too Marker has created material disputes on three out of

the four factors relevant to functionality.  This balance of factors is sufficient to create a triable

issue of fact on the functionality of Too Marker's unregistered trade dress.

Page 19 - FINDINGS AND RECOMMENDATION

C.        **Common Law Trademark Infringement (Count III)**

Defendants suggest that if the court finds that Too Marker's product configuration

and trade dress are functional, then plaintiffs' common law infringement claims are preempted by

federal patent law under *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S Ct 784, 11 L Ed

2d 661 (1964). Since I cannot find as a matter of law that Too Marker's registered product

configuration and unregistered trade dress are functional, Too Marker's common law

infringement claims are not preempted, and also survive summary judgment.

III.      **Plaintiffs' Motion for Partial Summary Judgment**

In 2007, Bongkeun Han, a Shinhan employee, applied for a design patent based on

drawings for the TOUCH marker (Gill Decl., #84, Ex. 1, 7.) In that application, Han asserted

that he had created an "original and ornamental design for a marker . . . ." (Gill Decl., #84, Ex. 7

at 4.) The design patent was granted in 2009. (*Id.* at 1.) Too Marker now moves for partial

summary judgment on the issue of functionality, arguing that Shinhan is judicially estopped from

asserting a functionality defense. Plaintiffs contend that the drawings submitted with the TOPIC

design patent depict the same product features which are listed in their own trademark

registration for the COPIC marker, including a squarish cross section, two end caps indented

relative to the body, flat cap ends, and a band at the juncture of cap and body. Thus, plaintiffs

assert that Shinhan staked a position before the patent office that the design features depicted in

its application were "ornamental," that is, non-functional. These representations, plaintiffs argue,

are inconsistent with defendants' stance before this court that the COPIC marker's product

configuration is functional.[7]  Although I find that Shinhan's design patent for the TOUCH marker

provides some evidence that the COPIC marker's product configuration is non-functional, the

design patent does not dictate that COPIC marker's configuration is non-functional as a matter of

law.

Judicial estoppel is an "equitable doctrine that precludes a party from gaining an

advantage by asserting one position, and then later seeking an advantage by taking a clearly

inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir.

2001).  The doctrine applies "when a party's position is tantamount to a knowing

misrepresentation to or even fraud on the court." *Johnson v. State of Or.*, 141 F.3d 1361, 1369

(9th Cir. 1998) (internal quotations and citation omitted).  The factors indicating judicial estoppel

are: (1) a party's later position is "clearly inconsistent" with its earlier position; (2) the "party has

succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance

of an inconsistent position in a later proceeding would create the perception that either the first or

the second court was misled;" and (3) "the party seeking to assert an inconsistent position would

derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*New Hampshire v. Maine*, 532 U.S. 742, 750-51, 121 S.Ct. 1808, 149 L.Ed.2d 968 (2001).

Importantly, "many cases have applied [judicial estoppel] where the prior statement was made in

---

[7] Plaintiffs place great weight on the Ninth Circuit's decision in *Disc Golf* to argue that judicial estoppel prevents Shinhan from asserting a functionality defense. *Disc Golf*, however, is readily distinguishable from this case.  There, the court explored the relationship between a utility patent and functionality, finding that estoppel prevented plaintiffs from arguing that the disc golf target's shape was functional to obtain an utility patent, but later that the shape was non-functional to access trademark protection for the same design. 158 F.3d at 1008.  Here, however, Shinhan obtained a design patent as opposed to an utility patent.

Page 21 - FINDINGS AND RECOMMENDATION

an administrative proceeding." *Risetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 604 (9th Cir. 1996) (citing cases involving judicial estoppel and workers' compensation, social security, insurance approval, ICC, and SSA proceedings).

Here, I agree with defendants that, although their design patent for the TOUCH marker provides some evidence of the non-functionality of Too Marker's COPIC product configuration, it does not conclusively establish that issue. Design patents are granted for new and nonobvious ornamental features that appear in connection with an article of manufacture. 35 U.S.C.A. § 171 ("Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title. The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.") Numerous cases demonstrate generally that while a design patent is some evidence of nonfunctionality, alone it is not sufficient to prove nonfunctionality for purposes of trademark. *See, e.g., In re Caterpillar Inc.*, 43 U.S.P.Q.2d 1335 (T.T.A.B. 1997) ("The fact that a configuration design is the subject of a design patent, as in this case, does not, without more, establish that the design is nonutilitarian and serves as a trademark."); *Goodyear Tire & Rubber Co. v. Interco Tire Corp.*, 49 U.S.P.Q.2d 1705, 1722 (T.T.A.B. 1998) (that applicant's tire tread design was once the subject of a design patent does not prove that the design has acquired secondary meaning); *accord* 1 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:92 (4th ed. 1998).

The Ninth Circuit has also described the limited impact of a design patent on the functionality of product configuration. In *Talking Rain*, the plaintiff Talking Rain owned both a registered trademark covering the shape of its bottle and a design patent for an ornamental design

Page 22 - FINDINGS AND RECOMMENDATION

of a combined beverage bottle and cap.  349 F.3d at 602.  There, the court held that defendant

SoBe, a producer of a similar bottle, had overcome the presumption of nonfunctionality created

by Talking Rain's registered trademark and affirmed the district court's grant of summary

judgment for SoBe.  *Id.* at 605.  The court also briefly addressed the evidentiary significance of

Talking Rain's design patent on question of functionality: "Talking Rain's design patent creates at

most another presumption of nonfunctionality, which has been overcome by the same evidence

rebutting Talking Rain's trademark registration."  *Id* at 605 n.3.  In other words, *Talking Rain*

establishes that even a design patent for the product in dispute cannot prevent an alleged infringer

from prevailing on summary judgment when there is sufficient evidence of a product's

functionality.

        Considering the role of a design patent in determining functionality in the trademark

context, Shinhan is not estopped from taking the position in this case that Too Marker's product

configuration is functional.  First, that position is not clearly inconsistent with Shinhan's

representations to the patent office that its TOUCH marker included some ornamental features.

As demonstrated by *Talking Rain*, obtaining a design patent for a design does not guarantee that

a trademark for that design is necessarily valid and non-functional.  Moreover, unlike in *Talking*

*Rain* where the plaintiff held a design patent on the same design as its asserted trademark, here

the design patent at issue is for a different, albeit, similar design.[8]  Additionally, as explained

above, there exists considerable factual debate about whether Too Marker's individual product

features and overall product configuration are functional.  For all of these same reasons,

---

     [8] The TOUCH marker featured a tapered cap not found in the COPIC marker.  (*See*
Berman Decl., #29, ¶6.)

Page 23 - FINDINGS AND RECOMMENDATION

Shinhan's position here also does not invoke the second factor indicative of judicial estoppel. Arguing that Too Marker's trademark is functional does not create the perception that either the patent office or this court is being misled. Finally, Shinhan does not derive an unfair advantage or impose an unfair detriment on plaintiffs by arguing that Too Marker's trademark is functional, since functionality is a valid affirmative defense to alleged trademark infringement and the public interest favors freely allowing challenges to the validity of claimed intellectual property protection. *See Nasalok Coating Corp. v. Nylok Corp.*, 522 F.3d 1320, 1327 (Fed. Cir. 2008). In sum, Too Marker has not demonstrated as a matter of law that judicial estoppel prevents Shinhan from asserting that Too Marker's product configuration is functional.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (#49), plaintiffs' motion to strike the declaration of Bill Cole (#78), and plaintiffs' cross motion for partial summary judgment (#81) should all be denied.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

//

//

//

Page 24 - FINDINGS AND RECOMMENDATION

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

IT IS SO ORDERED.

Dated this ___ day of October, 2010.

Honorable Paul Papak
United States Magistrate Judge

Page 25 - FINDINGS AND RECOMMENDATION